# SMITH *v.* ALABAMA.

## ERROR TO THE SUPREME COURT OF THE STATE OF ALABAMA.

Argued January 4, 1888. — Decided January 30, 1888.

The legislature of Alabama enacted a law entitled " an act to require loco-
motive engineers in this State to be examined and licensed by a board to
be appointed for that purpose," in which it was provided that it should be,
" unlawful for the engineer of any railroad train in this State to drive
or operate or engineer any train of cars or engine upon the main line or
roadbed of any railroad in this State which is used for the transporta-
tion of persons, passengers or freight, without first undergoing an ex-
amination and obtaining a license as hereinafter provided." The statute
then provided for the creation of a board of examiners and prescribed
their duties, and authorized them to issue licenses and imposed a license
fee, and then enacted " that any engineer violating the provisions of this
act shall be guilty of a misdemeanor, and, upon conviction, shall be fined
not less than fifty nor more than five hundred dollars, and may also be
sentenced to hard labor for the county for not more than six months."
Plaintiff in error was an engineer in the service of the Mobile and Ohio
Railroad Company. His duty was to " drive, operate, and engineer " a
locomotive engine drawing a passenger train on that road, regularly ply-
ing in one continuous trip between Mobile in Alabama and Corinth in
Mississippi, and *vice versa*, 60 miles of which trip was in Alabama, and
265 in Mississippi. He never " drove, operated, or engineered " a locomo-
tive engine hauling cars from one point to another point exclusively within
the State of Alabama. After the statute of Alabama took effect, he con-
tinued to perform such regular duties without taking out the license re-
quired by that act. He was proceeded against for a violation of the
statute, and was committed to jail to answer the charge. He petitioned
a state court for a writ of *habeas corpus* upon the ground that he was
employed in interstate commerce, and that the statute, so far as it ap-
plied to him, was a regulation of commerce among the States, and re-
pugnant to the Constitution of the United States. The writ was refused,
and the Supreme Court of the State of Alabama on appeal affirmed that
judgment. *Held:*
(1) That the statute of Alabama was not, in its nature, a regulation
    of commerce, even when applied to such a case as this;
(2) That it was an act of legislation within the scope of the powers re-
    served to the States, to regulate the relative rights and duties of
    persons within their respective territorial jurisdictions, being in-
    tended to operate so as to secure safety of persons and property
    for the public;
(3) That so far as it affected transactions of commerce among the States,

it did so only indirectly, incidentally and remotely, and not so as to burden or impede them, and that, in the particulars in which it touched those transactions at all, it was not in conflict with any express enactment of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence;

(4) That so far as it was alleged to contravene the Constitution of the United States, the statute was a valid law.

THE case, as stated by the court, was as follows:

This is a writ of error bringing into review a judgment of the Supreme Court of the State of Alabama, affirming a judgment of the city court of Mobile. The proceeding in the latter court was upon a writ of *habeas corpus* sued out by the plaintiff in error, seeking his discharge from the custody of the sheriff of Mobile County, in that State, under a commitment by a justice of the peace upon the charge of handling, engineering, driving, and operating an engine pulling a passenger train upon the Mobile and Ohio Railroad used in transporting passengers within the county of Mobile, and State of Alabama, without having obtained a license from the board of examiners appointed by the governor of said State, in accordance with the provisions of an act entitled " An act to require locomotive engineers in this State to be examined and licensed by a board to be appointed by the governor for that purpose," approved February 28, 1887, and after more than three months had elapsed from the date of appointment and qualification of said board. The plaintiff in error, upon complaint, was committed by the examining magistrate to the custody of the sheriff to answer an indictment for that alleged offence. The ground of the application for discharge upon the writ of *habeas corpus* in the city court of Mobile was, that the act of the General Assembly of the State of Alabama, for the violation of which he was held, was in contravention of that clause of the Constitution of the United States which confers upon Congress power to regulate commerce among the States.

The facts, as they appeared upon the hearing upon the return of the writ, are as follows: The petitioner at the time of his arrest on July 16, 1887, within the county of Mobile, was a locomotive engineer in the service of the Mobile and

Ohio Railroad Company, a corporation owning and operating a line of railroad forming a continuous and unbroken line of railway from Mobile, in the State of Alabama, to St. Louis, in the State of Missouri, and as such was then engaged in handling, operating, and driving a locomotive engine, attached to a regular passenger train on the Mobile and Ohio Railroad, within the county and State, consisting of a postal car carrying the United States mail to all parts of the Union, a Southern express car containing perishable freight, money packages, and other valuable-merchandise destined to Mississippi, Tennessee, Kentucky, and other States, passenger coaches, and a Pullman palace sleeping car occupied by passengers to be transported by said train to the States of Mississippi, Tennessee, and Kentucky. The petitioner's run, as a locomotive engineer in the service of the Mobile and Ohio Railroad Company, was regularly from the city of Mobile, in the State of Alabama, to Corinth, in the State of Mississippi, sixty miles of which run was in the State of Alabama, and two hundred and sixty-five miles in the State of Mississippi; and he never handled and operated an engine pulling a train of cars whose destination was a point within the State of Alabama when said engine and train of cars started from a point within that State. His train started at Mobile and ran through without change of coaches or cars on one continuous trip. His employment as locomotive engineer in the service of said company also required him to take charge of and handle, drive, and operate an engine drawing a passenger train which started from St. Louis, in the State of Missouri, destined to the city of Mobile, in the State of Alabama, said train being loaded with merchandise and occupied by passengers destined to Alabama and other States; this engine and train he took charge of at Corinth, in Mississippi, and handled, drove, and operated the same along and over the Mobile and Ohio Railroad through the States of Mississippi and Alabama to the city of Mobile. It frequently happened that he was ordered by the proper officers of the said company to handle, drive, and operate an engine drawing a passenger train loaded with merchandise, carrying the United States mail, and occupied by passengers, from the

city of Mobile, in Alabama, to the city of St. Louis, in Missouri, being allowed two lay-overs ; said train passing through the States of Alabama, Mississippi, Tennessee, Illinois, and into the State of Missouri.

It was admitted that the petitioner had not obtained the license required by the act of the General Assembly of the State of Alabama of February 28, 1887, and had not applied to the board of examiners, or any of its members, for such license, and that more than three months had elapsed since the appointment and qualification of said board of examiners, the same having been duly appointed by the governor of the State under the provisions of said act.

The statute of Alabama, the validity of which is thus drawn in question, as being contrary to the Constitution of the United States, and the validity of which has been affirmed by the judgment of the Supreme Court of Alabama now in review, is as follows :

"An Act to require locomotive engineers in this state to be examined and licensed by a board to be appointed by the governor for that purpose.

"Section 1. *Be it enacted by the General Assembly of Alabama,* That it shall be unlawful for the engineer of any railroad train in this state to drive or operate or engineer any train of cars or engine upon the main line or road-bed of any railroad in this state which is used for the transportation of persons, passengers, or freight, without first undergoing an examination and obtaining a license as hereinafter provided.

"Sec. 2. *Be it further enacted,* That before any locomotive engineer shall operate or drive an engine upon the main line or road-bed of any railroad in this state used for the transportation of persons or freight, he shall apply to the board of examiners hereinafter provided for in this act, and be examined by said board or by two or more members thereof, in practical mechanics, and concerning his knowledge of operating a locomotive engine and his competency as an engineer.

"Sec. 3. *Be it further enacted,* That upon the examination of any engineer as provided in this act, if the applicant is

found competent, he shall, upon payment of five dollars, receive a license, which shall be signed by each member of the board, and which shall set forth the fact that the said engineer has been duly examined as required by law, and is authorized to engage as an engineer on any of the railroads in this state.

"SEC. 4. *Be it further enacted*, That in addition to the examination provided for in section two (2), it shall be the duty of said board of examiners, before issuing the license provided for in this act, to inquire into the character and habits of all engineers applying for license; and in no case shall a license be issued if the applicant is found to be of reckless or intemperate habits.

"SEC. 5. *Be it further enacted*, That any engineer who, after procuring a license as provided in this act, shall at any time be guilty of any act of recklessness, carelessness, or negligence while running an engine by which any damage to persons or property is done, or who shall within six hours before, or during the time he is engaged in running an engine, be in a state of intoxication, shall forfeit his license, with all the rights and privileges acquired by it, indefinitely or for a stated period, as the board may determine after notifying such engineer to appear before the board, and inquiring into his act or conduct. It shall be the duty of the board to determine whether the engineer is unfit or incompetent by reason of any act or habit unknown at the time of his examination, or acquired or formed subsequent to it, and if it is made to appear that he is unfit or incompetent from any cause, the board shall revoke or cancel his license, and shall notify every railroad in this state of the action of the board.

"SEC. 6. *Be it further enacted*, That it shall be the duty of the governor, as soon after the approval of this act as practicable, to appoint and commission five skilled mechanics, one of whom shall reside in Birmingham, one in Montgomery, one in Mobile, one in Selma, and one in Eufaula, who shall constitute a board of examiners for locomotive engineers. It shall be the duty of said board to examine locomotive engineers, issue licenses, hear causes of complaint, revoke or cancel

licenses, and perform such duties as are provided in this act: *Provided*, That any one of said board shall have authority to examine applicants for licenses, and if the applicant is found competent, to issue license to him : *Provided further*, That for every examination provided in this act, the board or member thereof making the examination shall be entitled to five dollars, to be paid by the applicant.

"SEC. 7. *Be it further enacted*, That all engineers now employed in running or operating engines upon railroads in this state shall have three months after the appointment of the board herein provided within which to be examined and to obtain a license.

"SEC. 8. *Be it further enacted*, That any engineer violating the provisions of this act shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than fifty nor more than five hundred dollars, and may also be sentenced to hard labor for the county for not more than six months."

*Mr. E. L. Russell* and *Mr. B. B. Boone* for plaintiff in error.

No state has the power to pass a law affecting interstate commerce, where its regulation requires a uniform rule, or where the subject is national, and should admit of but one form or plan of regulation. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Mobile* v. *Kimball*, 102 U. S. 691; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Fargo* v. *Michigan*, 121 U. S. 230; *Western Union Tel. Co.* v. *Pendleton*, 122 U. S. 347.

The transportation of passengers and freight from one State to another is interstate commerce. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196. The plaintiff in error while operating an engine engaged in the business of interstate commerce is as much an instrument of such commerce as the locomotive or cars in which the merchandise or passengers are transported. To subject him, under the facts of this case, to examination and license and the payment of a fee before he is allowed to engage in the business of interstate commerce, is not a regulation local or limited in its nature, but one of gen-

eral application, and if it be held that the State of Alabama can impose such a system of regulation upon interstate commerce, then every State in the Union could likewise devise and impose an independent system in accordance with its own policy and requirements, and it might so happen that each State would have a different system of laws prescribing the qualifications and competency of a locomotive engineer.

Congress, by an act approved Feb. 4, 1887, twenty-four days before the passage and approval of the act of Alabama in question, legislated upon the whole subject of interstate commerce carried on by the railroads of this country, and no provision is made therein for the examination and license of locomotive engineers, engaged in the business of interstate commerce, and this court has held that the non-exercise of the power in respect to the regulation of commerce between the States, is equivalent to a declaration that such commerce shall be free and untrammelled. *Welton* v. *Missouri*, 91 U. S. 175 ; *Brown* v. *Houston*, 114 U. S. 622 ; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196 ; *Pickard* v. *Pullman Southern Car Co.*, 117 U. S. 34 ; *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557 ; *Walling* v. *Michigan*, 116 U. S. 446 ; *Corson* v. *Maryland*, 120 U. S. 502 ; *Hall* v. *DeCuir*, 95 U. S. 485 ; *Railroad Co.* v. *Husen*, 95 U. S. 465.

The act of Alabama, when enforced against plaintiff in error, is not a local regulation. A State has no power to prescribe qualifications for persons engaged in interstate commerce. Such business is open and free unless restricted by Congress. *Webber* v. *Virginia*, 103 U. S. 344; *Henderson* v. *New York*, 92 U. S. 259 ; *People* v. *Compagnie Transatlantique*, 107 U. S. 59. If this statute can be maintained, the State can exercise the same power against every person employed in interstate commerce, and thus practically forbid all from engaging in it within its boundaries, without first obtaining the authorization of such State. Such action would seem to be clearly at variance with the commercial clause of the Constitution of the United States. The general rule deducible from the decisions of this court concerning the constitutional immunity, is, that a State will not be permitted to impose conditions which will amount

to a regulation of interstate commerce. It has been held by this court that foreign corporations carrying on such business cannot be excluded from a State, nor can they be required to conform to any regulation by the State as a condition precedent to the carrying on of such interstate commerce. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1; *Cooper Manufacturing Co.* v. *Ferguson*, 113 U. S. 727; *Case of the State Freight State Tax*, 15 Wall. 232.

Under the act of Congress, entitled " An act to regulate commerce," approved February 4th, 1887, Congress exercised to the extent it deemed necessary the power to regulate commerce with foreign nations and among the several States, and has left it free to all persons to engage in it, and no State can alter, annul or abridge that freedom. If the State of Alabama can prescribe that an engineer before he can engage in the business of interstate commerce as appears from the facts of this case, must secure a license from the State, then, the other thirty-nine States of the Union can do likewise, and a locomotive engineer seeking to engage in the business of operating an engine carrying freight and passengers from one State to another would be compelled to obtain forty different licenses, and might have to qualify himself to meet forty different sets of requirements.

This court held in the case of *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, that it was not only the right, but the duty of Congress to take care that intercourse among the States is not obstructed by state legislation. We contend that commerce among the several States could not be maintained under, or at least, could not submit to such obstruction as the procurement by an engineer of a license from forty different States before he would be authorized to engage in the business of interstate commerce.

*Mr. T. N. McClellan*, Attorney General of the State of Alabama, for defendant in error.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

The grant of power to Congress in the Constitution to regulate commerce with foreign nations and among the several States, it is conceded, is paramount over all legislative powers which, in consequence of not having been granted to Congress, are reserved to the States. It follows that any legislation of a State, although in pursuance of an acknowledged power reserved to it, which conflicts with the actual exercise of the power of Congress over the subject of commerce, must give way before the supremacy of the national authority. As the regulation of commerce may consist in abstaining from prescribing positive rules for its conduct, it cannot always be said that the power to regulate is dormant because not affirmatively exercised. And when it is manifest that Congress intends to leave that commerce, which is subject to its jurisdiction, free and unfettered by any positive regulations, such intention would be contravened by state laws operating as regulations of commerce as much as though these had been expressly forbidden. In such cases, the existence of the power to regulate commerce in Congress has been construed to be not only paramount but exclusive, so as to withdraw the subject as the basis of legislation altogether from the States.

There are many cases, however, where the acknowledged powers of a State may be exerted and applied in such a manner as to affect foreign or interstate commerce without being intended to operate as commercial regulations. If their operation and application in such cases regulate such commerce, so as to conflict with the regulation of the same subject by Congress, either as expressed in positive laws or implied from the absence of legislation, such legislation on the part of the State, to the extent of that conflict, must be regarded as annulled. To draw the line of interference between the two fields of jurisdiction, and to define and declare the instances of unconstitutional encroachment, is a judicial question often of much difficulty, the solution of which, perhaps, is not to be found in any single and exact rule of decision. Some general lines of discrimination, however, have been drawn in varied and numerous decisions of this court. It has been uniformly held, for example, that the States cannot by legislation place burdens

upon commerce with foreign nations or among the several States. "But upon an examination of the cases in which they were rendered," as was said in *Sherlock* v. *Alling*, 93 U. S. 99, 102, "it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted. In all the cases, the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuit in particular channels, or conditions for carrying it on." In that case it was held that a statute of Indiana, giving a right of action to the personal representatives of the deceased where his death was caused by the wrongful act or omission of another, was applicable to the case of a loss of life occasioned by a collision between steamboats navigating the Ohio River engaged in interstate commerce, and did not amount to a regulation of commerce in violation of the Constitution of the United States. On this point the court said (p. 103): "General legislation of this kind, prescribing the liabilities or duties of citizens of a state, without distinction as to pursuit or calling, is not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. Objection might, with equal propriety, be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates of persons engaged in such commerce. In conferring upon Congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution. . . . And it may be said generally, that the legislation of a state, not directed against commerce or

any of its regulations, but relating to the rights, duties and liabilities of citizens, and only indirectly and remotely affect- ing the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit." In that case it was admitted, in the opinion of the court, that Congress might legislate, under the power to regulate commerce, touching the liability of parties for marine torts resulting in the death of the persons injured, but that, in the absence of such legislation by Congress, the statute of the State, giving such right of action, constituted no encroachment upon the commercial power of Congress, although, as was also said (p. 103), " It is true that the com- mercial power conferred by the Constitution is one without limitation. It authorizes legislation with respect to all the subjects of foreign and interstate commerce, the persons engaged in it, and the instruments by which it is carried on."

The statute of Indiana held to be valid in that case was an addition to and an amendment of the general body of the law previously existing and in force regulating the relative rights and duties of persons within the jurisdiction of the State, and operating upon them, even when engaged in the business of interstate commerce. This general system of law, subject to be modified by state legislation, whether consisting in that customary law which prevails as the common law of the land in each state, or as a code of positive provisions expressly en- acted, is nevertheless the law of the State in which it is ad- ministered, and derives all its force and effect from the actual or presumed exercise of its legislative power. It does not emanate from the authority of the national government, nor flow from the exercise of any legislative powers conferred upon Congress by the Constitution of the United States, nor can it be implied as existing by force of any other legislative author- ity than that of the several states in which it is enforced. It has never been doubted but that this entire body and system of law, regulating in general the relative rights and duties of persons within the territorial jurisdiction of the State, without regard to their pursuits, is subject to change at the will of the

legislature of each State, except as that will may be restrained by the Constitution of the United States. It is to this law that persons within the scope of its operation look for the definition of their rights and for the redress of wrongs committed upon them. It is the source of all those relative obligations and duties enforceable by law, the observance of which the State undertakes to enforce as its public policy. And it was in contemplation of the continued existence of this separate system of law in each state that the Constitution of the United States was framed and ordained with such legislative powers as are therein granted expressly or by reasonable implication.

It is among these laws of the states, therefore, that we find provisions concerning the rights and duties of common carriers of persons and merchandise, whether by land or by water, and the means authorized by which injuries resulting from the failure properly to perform their obligations may be either prevented or redressed. A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable according to the laws of the State for acts of nonfeasance or misfeasance committed within its limits. If he fail to deliver goods to the proper consignee at the right time or place, he is liable in an action for damages under the laws of the State in its courts; or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, a right of action for the consequent damage is given by the local law. In neither case would it be a defence that the law giving the right to redress was void as being an unconstitutional regulation of commerce by the State. This, indeed, was the very point decided in *Sherlock* v. *Alling*, above cited. If it is competent for the State thus to administer justice according to its own laws for wrongs done and injuries suffered, when committed and inflicted by defendants while engaged in the business of interstate or foreign commerce, notwithstanding the power over those subjects conferred upon Congress by the Constitution, what is there to forbid the State, in the further exercise of the same jurisdiction, to prescribe the precautions and safeguards foreseen to be necessary and proper to prevent by anticipation

those wrongs and injuries which, after they have been inflicted, it is admitted the State has power to redress and punish? If the State has power to secure to passengers conveyed by common carriers in their vehicles of transportation a right of action for the recovery of damages occasioned by the negligence of the carrier in not providing safe and suitable vehicles, or employés of sufficient skill and knowledge, or in not properly conducting and managing the act of transportation, why may not the State also impose, on behalf of the public, as additional means of prevention, penalties for the non-observance of these precautions? Why may it not define and declare what particular things shall be done and observed by such a carrier in order to insure the safety of the persons and things he carries, or of the persons and property of others liable to be affected by them?

It is that law which defines who are or may be common carriers, and prescribes the means they shall adopt for the safety of that which is committed to their charge, and the rules according to which, under varying conditions, their conduct shall be measured and judged; which declares that the common carrier owes the duty of care, and what shall constitute that negligence for which he shall be responsible.

But for the provisions on the subject found in the local law of each State, there would be no legal obligation on the part of the carrier, whether *ex contractu* or *ex delicto*, to those who employ him; or if the local law is held not to apply where the carrier is engaged in foreign or interstate commerce, then, in the absence of laws passed by Congress or presumed to be adopted by it, there can be no rule of decision based upon rights and duties supposed to grow out of the relation of such carriers to the public or to individuals. In other words, if the law of the particular State does not govern that relation, and prescribe the rights and duties which it implies, then there is and can be no law that does until Congress expressly supplies it, or is held by implication to have supplied it, in cases within its jurisdiction over foreign and interstate commerce. The failure of Congress to legislate can be construed only as an intention not to disturb what already exists,

and is the mode by which it adopts, for cases within the scope of its power, the rule of the state law, which until displaced covers the subject.

There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England as adopted by the several States each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes. *Wheaton* v. *Peters*, 8 Pet. 591. A determination in a given case of what that law is may be different in a court of the United States from that which prevails in the judicial tribunals of a particular State. This arises from the circumstance that the courts of the United States, in cases within their jurisdiction, where they are called upon to administer the law of the State in which they sit or by which the transaction is governed, exercise an independent though concurrent jurisdiction, and are required to ascertain and declare the law according to their own judgment. This is illustrated by the case of *Railroad Co.* v. *Lockwood*, 17 Wall. 357, where the common law prevailing in the State of New York, in reference to the liability of common carriers for negligence, received a different interpretation from that placed upon it by the judicial tribunals of the State; but the law as applied was none the less the law of that State.

In cases, also, arising under the *lex mercatoria*, or law merchant, by reason of its international character, this court has held itself less bound by the decisions of the state courts than in other cases. *Swift* v. *Tyson*, 16 Pet. 1; *Carpenter* v. *Providence Washington Insurance Co.*, 16 Pet. 495; *Oates* v. *National Bank*, 100 U. S. 239; *Railroad Company* v. *National Bank*, 102 U. S. 14.

There is, however, one clear exception to the statement that there is no national common law. The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history. The code of constitutional and statutory construction which, therefore, is gradually formed by the judgments of this court, in the application of the Constitution and the laws

and treaties made in pursuance thereof, has for its basis so much of the common law as may be implied in the subject, and constitutes a common law resting on national authority. *Moore* v. *United States*, 91 U. S. 270.

The statute of Alabama, the validity of which is drawn in question in this case, does not fall within this exception. It would, indeed, be competent for Congress to legislate upon its subject matter, and to prescribe the qualifications of locomotive engineers for employment by carriers engaged in foreign or interstate commerce. It has legislated upon a similar subject by prescribing the qualifications for pilots and engineers of steam vessels engaged in the coasting trade and navigating the inland waters of the United States while engaged in commerce among the States, Rev. Stat. Tit. 52, §§ 4399–4500, and such legislation undoubtedly is justified on the ground that it is incident to the power to regulate interstate commerce.

In *Sinnot* v. *Davenport*, 22 How. 227, this court adjudged a law of the State of Alabama to be unconstitutional, so far as it applied to vessels engaged in interstate commerce, which prohibited any steamboat from navigating any of the waters of the State without complying with certain prescribed conditions, inconsistent with the act of Congress of February 17, 1793, in reference to the enrollment and licensing of vessels engaged in the coasting trade. In that case it was said (p. 243): "The whole commercial marine of the country is placed by the Constitution under the regulation of Congress, and all laws passed by that body in the regulation of navigation and trade, whether foreign or coastwise, is therefore but the exercise of an undisputed power. When, therefore, an act of the legislature of a State prescribes a regulation of the subject repugnant to and inconsistent with the regulation of Congress, the state law must give way, and this without regard to the source of power whence the state legislature derived its enactment."

The power might with equal authority be exercised in prescribing the qualifications for locomotive engineers employed by railroad companies engaged in the transportation of passengers and goods among the States, and in that case would super-

sede any conflicting provisions on the same subject made by local authority.

But the provisions on the subject contained in the statute of Alabama under consideration are not regulations of interstate commerce. It is a misnomer to call them such. Considered in themselves, they are parts of that body of the local law which, as we have already seen, properly governs the relation between carriers of passengers and merchandise and the public who employ them, which are not displaced until they come in conflict with express enactments of Congress in the exercise of its power over commerce, and which, until so displaced, according to the evident intention of Congress, remain as the law governing carriers in the discharge of their obligations, whether engaged in the purely internal commerce of the State or in commerce among the States.

No objection to the statute, as an impediment to the free transaction of commerce among the States, can be found in any of its special provisions. It requires that every locomotive engineer shall have a license, but it does not limit the number of persons who may be licensed nor prescribe any arbitrary conditions to the grant. The fee of five dollars to be paid by an applicant for his examination is not a provision for raising revenue, but is no more than an equivalent for the service rendered, and cannot be considered in the light of a tax or burden upon transportation. The applicant is required before obtaining his license to satisfy a board of examiners in reference to his knowledge of practical mechanics, his skill in operating a locomotive engine, and his general competency as an engineer, and the board before issuing the license is required to inquire into his character and habits, and to withhold the license if he be found to be reckless or intemperate.

Certainly it is the duty of every carrier, whether engaged in the domestic commerce of the State or in interstate commerce, to provide and furnish itself with locomotive engineers of this precise description, competent and well qualified, skilled and sober; and if, by reason of carelessness in the selection of an engineer not so qualified, injury or loss are caused, the carrier, no matter in what business engaged, is responsible accord-

ing to the local law admitted to govern in such cases, in the absence of congressional legislation.

The statute in question further provides that any engineer licensed under the act shall forfeit his license if at any time found guilty by the board of examiners of an act of recklessness, carelessness, or negligence while running an engine, by which damage to person or property is done, or who shall, immediately preceding or during the time he is engaged in running an engine, be in a state of intoxication; and the board are authorized to revoke and cancel the license whenever they shall be satisfied of the unfitness or incompetency of the engineer by reason of any act or habit unknown at the time of his examination, or acquired or formed subsequent to it. The eighth section of the act declares that any engineer violating its provisions shall be guilty of a misdemeanor, and upon conviction inflicts upon him the punishment of a fine not less than $50 nor more than $500, and also that he may be sentenced to hard labor for the county for not more than six months.

If a locomotive engineer, running an engine, as was the petitioner in this case, in the business of transporting passengers and goods between Alabama and other States, should, while in that State, by mere negligence and recklessness in operating his engine, cause the death of one or more passengers carried, he might certainly be held to answer to the criminal laws of the State if they declare the offence in such a case to be manslaughter. The power to punish for the offence after it is committed certainly includes the power to provide penalties directed, as are those in the statute in question, against those acts of omission which, if performed, would prevent the commission of the larger offence.

It is to be remembered that railroads are not natural highways of trade and commerce. They are artificial creations; they are constructed within the territorial limits of a State, and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the State. The places where they may be located, and the plans according to which they must be constructed, are prescribed by the legislation of the State. Their operation

requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care. The safety of the public in person and property demands the use of specific guards and precautions. The width of the gauge, the character of the grades, the mode of crossing streams by culverts and bridges, the kind of cuts and tunnels, the mode of crossing other highways, the placing of watchmen and signals at points of special danger, the rate of speed at stations and through villages, towns, and cities, are all matters naturally and peculiarly within the provisions of that law from the authority of which these modern highways of commerce derive their existence. The rules prescribed for their construction and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not *per se* regulations of commerce; it is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of Congress exerted on the same subject, that they can be required to give way to the supreme authority of the Constitution.

In conclusion, we find, therefore, first, that the statute of Alabama, the validity of which is under consideration, is not, considered in its own nature, a regulation of interstate commerce, even when applied as in the case under consideration; secondly, that it is properly an act of legislation within the scope of the admitted power reserved to the State to regulate the relative rights and duties of persons being and acting within its territorial jurisdiction, intended to operate so as to secure for the public, safety of person and property; and, thirdly, that, so far as it affects transactions of commerce among the States, it does so only indirectly, incidentally, and remotely, and not so as to burden or impede them, and, in the particulars in which it touches those transactions at all, it is not in conflict with any express enactment of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence.

For these reasons, we hold this statute, so far as it is alleged

to contravene the Constitution of the United States, to be a valid law.

*The judgment of the Supreme Court of Alabama is therefore affirmed.*

MR. JUSTICE BRADLEY dissented.