Joseph A. Sarafite, J.
This is a proceeding to set aside an order issued by the New York State Commission for Human Rights, except so much thereof as dismissed charges of unlawful discriminatory practice alleged to have been committed by persons not parties to this proceeding.
Respondents, constituting the members of the New York State Commission for Human Rights, cross-move for an order pur *500 suant to section 298 of the Executive Law enforcing in their entirety those provisions of the order which are directed against the petitioners and to dismiss the petition.
After hearings, the commission found that petitioners, and one Haynes, a member of the Seniority Board (hereinafter described) not a party to this proceeding, had engaged in certain unlawful discriminatory practices and ordered them to take certain remedial actions.
In December, 1960, one Randolph filed a verified complaint charging petitioners and others with unlawful discrimination in employment. The amended complaint charged discrimination against Randolph both because he is a Negro and because he had filed a previous complaint of unlawful discriminatory practices with the commission and had opposed unlawful discriminatory practices.
In substance, the amended complaint states: Randolph is a Negro longshoreman. Under the collective bargaining agreement between the New York Shipping Association (N.Y.S.A.), and the International Longshoremen’s Association (I.L.A.), a system of seniority for longshoremen in the Port of New York has been set up. This seniority system derives from a 1958 arbitration award known as the “ Jensen Award ”. Pursuant to the Jensen Award, the waterfront area is divided into sections. A longshoreman identified with a particular section is to be granted certain hiring preferences over other longshoremen in the hiring for that section during the shape-up process. The Seniority Board administers the Jensen Award and issues seniority cards which reflect the seniority rights of longshoremen. The Seniority Board consists of eight members. Four are designated by the N.Y.S.A., the shippers’ bargaining agent, and four are designated by the I.L.A., the bargaining agent for longshoremen in the Port of Greater New York.
In January, 1960 Randolph applied to the Seniority Board for a section 9 seniority card in the A group. Among men in the same section, priority in hiring is given on the basis of length of service in the longshore industry, which priority is reflected in an A, B or 0 grouping. The board issued to Randolph a Section 9, Group C seniority card. He thus applied to be raised to Section 9, Group B, and his application was granted. Approximately two months later he was admitted to membership in the petitioning Local 791, I.L.A., the local which normally services longshoremen in Section 9.
In August, 1960 Randolph’s seniority was disregarded by a Grace Line hiring agent who was hiring drivers of hi-lo trucks. *501 He charged that this company had never hired a Negro driver from the shape-np. Randolph protested the violation of seniority to Local 791 and the Seniority Board. He also filed a complaint of racial discrimination by Grace Line with the commission. On November 2, 1960 the Seniority Board held a hearing on his grievance at which time, the complaint alleges, Miskell, one of the petitioners and the business agent of Local 791, I.L.A., unjustly opposed it. As a result of this grievance and his complaint to the commission, on November 25, 1960 Randolph became the first Negro driver for Grace Line and continued to obtain such employment until December 15, 1960. On the latter date, he was hired by Grace Line and surrendered his seniority card to the hiring agent for customary validation. When he arrived at the Grace Line pier, he discovered that Miskell had taken it from Grace Line and had transmitted it to Haynes, cochairman of the Seniority Board. That same day, Randolph met with Haynes who informed him that the Seniority Board had revoked his assignment to Section 9 and that Randolph would have to select another section. Haynes added Randolph could not remain in Section 9 pending a determination of the board as to where he properly belonged because he “ had made trouble” there and “ the boys don’t want you around Under the circumstances, Randolph requested assignment to Section 6, which Haynes immediately granted. The next day, Randolph was advised by Haynes’ secretary that he should transfer his membership from Local 791 to Local 1814, which services Section 6.
The amended complaint further charged that the members of the Seniority Board deprived Randolph of Section 9 status because he is a Negro and because of his previous opposition to and complaint against unlawful discriminatory practices; aided and abetted Local 791 and Miskell to force Randolph to accept transfer to another section for the same reasons; attempted to aid and abet Local 791 and Miskell to force Randolph to transfer his union membership from Local 791 to Local 1814 for the same reasons.
Local 791 and Miskell were charged with opposing Randolph in a legitimate seniority grievance for the same reasons; in challenging Randolph’s right to hold a Section 9 card for the same reasons; and aided, abetted or compelled the members of the Seniority Board to discriminate against Randolph by rescinding his assignment to Section 9, or attempted to do so.
After efforts of conciliation and settlement failed, hearings were duly held on the complaint.
*502 On January 24,1963 the commission issued the order which is the subject of this proceeding. In essence the commission decided that none of the respondents to the complaint, including the petitioners in this application, had discriminated against Randolph because he is a Negro; that seven of the eight members of the Seniority Board had not committed any of the unlawful discriminatory practices charged; that Local 791 and Miskell had discriminated against Randolph by opposing his seniority grievance against Grace Line and by challenging his Section 9 status because he had complained to the commission about unlawful discriminatory practices and had opposed such practices; that Haynes had aided and abetted Local 791 and Miskell and thereby violated the aiding and abetting section.
The findings of the commission find ample support in the record. There is no difficulty in discovering herein factual basis for the findings reached by the commission. Such findings are accepted by the courts if they have warrant in the record and a reasonable basis in law (Matter of Mounting & Finishing Co. v. McGoldrick, 294 N. Y. 104; Matter of Holland v. Edwards, 307 N. Y. 38). The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the commission (Rochester Tel. Corp. v. United States, 307 U. S. 125, 146).
The charge that the commission has acted in a field pre-empted by Federal law is not persuasive. Those portions of the commission’s orders which are directed against petitioners do not involve any of petitioners’ activities in interstate or foreign commerce within the meaning of the Commerce Clause (U. S. Const., art. I, § 8). Though petitioners miay have other contacts with interstate or foreign commerce, the State of New York is not without power to regulate petitioners’ activities in this case which is outside the scope of the 'Commerce Clause.
United States v. South-Eastern Underwriters Assn. (322 U. S. 533, 548) clearly expresses the point in controversy: “It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated * * * by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather *503 whether, in each case, the competing demands of the state and national interests involved can he accommodated. ’ ’
Matters relating to hiring and employment can be regulated by States, even in cases where the employer is engaged in interstate or foreign commerce (Smith v. Alabama, 124 U. S. 465; Nashville, Chattanooga & St. Louis Ry. Co. v. Alabama, 128 U. S. 96; Chicago Rock Is. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453; St. Louis, Iron Mountain & Southern Ry. Co. v. Arkansas, 240 U. S. 518; Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249; Southern Pacific Co. v. Arizona, 325 U. S. 761, 782; Erie R. R. Co. v. Williams, 233 U. S. 685).
Additionally, the application of the order to petitioners will impose no burden upon interstate or foreign commerce. The Supreme Court of the United States has upheld, under the Tenth Amendment, the power of the New York Legislature to enact laws against discrimination (Railway Mail Assn. v. Corsi, 326 U. S. 88). That case, like the case at bar, involved a labor organization whose members were engaged in interstate commerce. There is no substance to the other points raised.
Accordingly, the court determines that the findings of the commission find adequate support in the record. The application to set aside portions of the order is denied. The cross application directed against petitioners is granted.