## MACIO DAVIS *v.* STATE OF MARYLAND

[No. 155, September Term, 1977.]

*Decided August 18, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Edward H. Nabb* and *Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for appellant.

*Edward F. Lawson, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *John B. Griffith, Assistant Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

This appeal calls upon us to determine whether Maryland statutes imposing limitations on the possession of certain kinds and sizes of crabs are unconstitutional as affronting the Commerce Clause of the Federal Constitution.

## I

*Callinectes sapidus* Rathbun [1] is a species of blue crab which inhabits the Chesapeake Bay and its tributaries. It is usually known as a "hard crab" because of the hard shell in which it is encased most of its life.[2] It grows by moulting or shedding this shell, and during the various stages of the moulting process it is referred to by other names. For a brief period after shedding its hard shell, the new shell is very soft, and the crab is called a "soft crab." The moulting begins when a soft shell has fully developed under the hard shell, and the hard shell begins to "bust." This is indicated by a pink line or rim on the edge of that part of the back fin next to the outer section of the fin. At this stage it is a "buster" or "peeler." Maryland Code (1974, 1977 Cum. Supp.) § 4-801 (e) of the Natural Resources Article.[3] An under-developed peeler is a "green crab." § 4-801 (d). After the hard shell has been shed, the exposed soft shell starts to harden. At this stage the crab is a "paper back" or "buckram crab." § 4-801 (b). At other stages in the development of the blue crab's life cycle it is called a "fat crab" and a "snot crab." *See* W. W. Warner, Beautiful Swimmers — Watermen, Crabs and the Chesapeake Bay 21-22, 27-28, 90-119 (1976).

The hard crab is an important natural resource of Maryland with a significant impact on the economy of this

---

**1.** *Callinectes* is Greek for beautiful swimmer. *Sapidus* means tasty or savory in Latin. Rathbun is the late Dr. Mary J. Rathbun of the Smithsonian Institution, who first gave the crab its specific name. W. W. Warner, Beautiful Swimmers — Watermen, Crabs and the Chesapeake Bay 90-119 (1976).

**2.** Hereinafter, "hard crab" means *Callinectes sapidus* Rathbun.

**3.** In this opinion section references, unless otherwise indicated, are to the Natural Resources Article of the Maryland Code of 1974, or where appropriate, the 1977 cumulative supplement thereto.

State. It is treasured as food,[4] and on the way to the ultimate consumer, it may pass through the hands of a waterman who catches it, a packer who processes it to obtain the meat, a broker or wholesaler, and a merchant or retailer, such as a store, a restaurant, or a "crab house."

## II

The General Assembly has declared the intention to insure the preservation, development, wise use, and enjoyment of all the natural resources for greatest benefits to the state and its citizens. § 1-101 (b). To this end it created the Department of Natural Resources of Maryland as a principal department of the state government, headed by a Secretary whose reputation and experience demonstrate his interest in the field of natural resources. § 1-101 (a). One of the natural resources which is the responsibility of the Secretary to preserve, conserve, enhance, and perpetuate, § 1-104 (a), is the hard crab. Title 4 of the Natural Resources Article concerns "Fish and Fisheries." The Fisheries Administration is created within the Department of Natural Resources, § 4-201, and the Secretary of Natural Resources is expressly made responsible for conservation management of the fish, fisheries, fish resources and aquatic life within the state, § 4-202.[5] In title 4 "Fish" includes "crustaceans and mollusks," § 4-101 (f), and, according to the Revisor's Note the term "crustaceans and mollusks" includes crabs. The blue crab, under its various names, is the subject of subtitle 8 of title 4. § 4-801 (c) and Revisor's Note thereto, and § 4-802. It

---

4. The blue crab may be eaten simply steamed with certain condiments or in a variety of more sophisticated forms, such as crab cakes, crab soup, crab imperial, deviled crab, crab norfolk, crab cocktail and crab salad. On many a Maryland summer evening a heap of steamed hard crabs may be found in the center of a newspaper-covered table where family and friends, beer at hand, are gathered to "eat hard crabs," extracting the meat with crab mallet and knife by a ritualistic technique handed down from generation to generation and painstakingly taught to newcomers partaking of the gastronomic delicacy for the first time. And, of course, the "crab feast," a seafood equivalent of a bull roast, is a Maryland tradition.

5. "Every right, power, duty, obligation, and function previously conferred upon or exercised by the Department of Game and Inland Fish or the Fish and Wildlife Administration" were transferred to the Department of Natural Resources. § 4-203.

is manifest that the General Assembly fully recognized the importance of the blue crab as a natural resource of the State. It established a closed season, *see* § 4-101 (c), by proscribing: "A person may not catch hard crabs in any waters of the State, between January 1 and April 1." § 4-808.[6] It further restricted the catching and possessing of hard crabs, soft crabs, fat crabs, green crabs, and buckram crabs. Section 4-809 (a) provides:

> "A person may not catch or possess more than four hard crabs per bushel or ten hard crabs per barrel which measure less than 5 inches across the shell from tip to tip of spike, any peelers measuring less than 3 inches across the shell from tip to tip of spike, or any soft crabs measuring less than three and one-half inches across the shell from tip to tip of spike."

Section 4-809 (d) prohibits a person from catching, possessing, or keeping in floats any green crab which is less than five inches from tip to tip of the spikes, or any buckram crab of any size. Section 4-809 (b), applicable only to the waters of Worcester County, declares that "a person may not catch, possess, or keep in floats any fat crabs, or any crab known as snot crab, green crab, or buckram crab." But "the minimum size of crabs does not apply to mature female crabs, identified by the rounded apron," in the waters of that county. § 4-809 (c). By Acts 1975, ch. 174, however, "crabs imported into Maryland during the closed season for catching crabs" were exempted from the provisions of § 4-809 (a) "if the person possessing the imported crabs has a certificate of origin." § 4-809 (e). The restriction on the possession of undersized crabs is applicable to crabs caught in waters outside Maryland:

> "Any local or general law of the State which sets
> or regulates minimum and maximum size of fish,
> or regulates or prohibits the sale of fish, applies

---

6. Acts 1974, ch. 541 eliminated an exception as to the waters of Worcester County.

whether the fish are caught in the waters of the State or in the waters of any other state, county, or territory and brought into the State. Any fine or penalty prescribed for violation of these laws applies to the same extent." § 4-102 (a).[7]

It is a misdemeanor to violate a provision of title 4, punishable by fine or imprisonment or both, with a harsher penalty authorized for a second or subsequent offense occurring within two years of any prior violation. Section 4-1201.[8]

## III

Macio Davis was charged under a citation issued by a natural resources police officer for violating the provisions of § 4-809 (a). *See* §§ 1-201 through 1-205. He was tried in the District Court of Maryland, convicted and fined $20 and costs. On appeal to the Circuit Court for Dorchester County he was again convicted on a trial *de novo,* and the same punishment was imposed. We granted his petition for a writ of certiorari to review the judgment of that court. Maryland Code (1974, 1977 Cum. Supp.) § 12-305, § 12-307, and § 12-401 of the Courts and Judicial Proceedings Article.

The facts surrounding Davis's conviction are not disputed. J.M. Clayton Co., located in Cambridge, Maryland, had been

---

7. Acts 1977, ch. 232, designated the former provisions of § 4-102 as subsection (a) and added subsection (b) concerning the catching of white perch in the Potomac River.

We note that the Department of Natural Resources may adopt rules and regulations designed to protect and conserve crabs by restricting the possession of them and to control the catching of them in a wide variety of ways. §§ 4-803, 4-810. Our attention has not been called to any rules or regulations which the department has adopted pursuant to these authorizations. There is legislation relating to licensing commercial crabbers, §§ 4-804, 4-805, and 4-806, and to restrictions on use of crab pots, § 4-811, and to landing crabs in Worcester County, § 4-802.1.

8. By Acts 1978, ch. 831, effective 1 July 1978, "[a] common carrier transporting fish who is not the buyer, seller, or catcher of the fish or is not controlled by the buyer, seller, or catcher of the fish is not subject to any penalty under [§ 4-1201] for transporting fish which is either unlawfully caught or of unlawful size provided that the operator of the common carrier has in his possession a valid bill of lading, stating the origin, shipper, destination or receiver of the fish and the common carrier does not know or have reason to know that the fish were unlawfully caught or of unlawful size."

in the crab processing business for over 45 years.[9] It is necessary that it import crabs from other states to keep the 96 persons it employs working year-round. There are only two brief periods, in July and October, when local crabs are sufficient to provide even 50% of its needs. The size laws in the states from which the crabs were imported were similar to those of Maryland, but the percentage of undersized crabs permitted varied. Clayton ordered crabs from Courtney Seafood, a broker in Virginia. Davis was employed as a truck driver for Courtney, and on 13 July 1977 he delivered 230 bushels of crabs, packed in bushel baskets, to the Clayton processing plant in Cambridge. An inspection of about a dozen of the baskets by a natural resources marine police sergeant showed that there were 42 undersized crabs per bushel. The crabs were ordered in Maryland, caught in Virginia, and hauled to Maryland to be processed. The meat of the Virginia crabs would be mingled with the meat of the local crabs and shipped to out of state buyers. The crabs imported were not unlawful in Virginia. They had passed inspection there, and Davis had a delivery slip showing the origin, destination, price and number of bushels he was to deliver to Clayton. If they had been transported into Maryland during the closed season, there would have been no violation of the law. § 4-809 (e).

Clayton's president testified that the crabs were Virginia seaside crabs and that generally they could be distinguished from local crabs "by the color and so forth." The marine police officer said that after 20 years of service, he could distinguish a seaside crab from an ordinary Chesapeake Bay Crab "sometimes. Not all the time, but in general." [10] In any event, it was not suggested that the crabs in the possession of Davis had been caught in Maryland waters or that there had been any tampering with the containers in which they were packed.

---

9. There was evidence that of the 16 packers in Dorchester County employing 642 persons, J. M. Clayton Co. was the largest.

10. As we have indicated, in subtitle 8, title 4 of the Natural Resources Article, " '[c]rab' means the blue crab species," § 4-801 (c), and the provisions of subtitle 8 expressly "apply only to the species of crab commonly known as the blue crab," § 4-802. Davis has at no time contended that the crabs in his possession were other than the species commonly known as the blue crab so as not to be within the ambit of § 4-809 (a).

The State conceded in oral argument before us that the crabs had been transported in interstate commerce.

Davis does not deny that the hard crabs found in his possession contained more than four undersized crabs per bushel, and that, therefore, he was in violation of § 4-809 (a) as charged. He seeks reversal, however, on the ground that §§ 4-809 (a) and 4-102 (a) "are unconstitutional, being in violation of the Commerce Clause of the Federal Constitution . . ." which, by its terms, grants Congress the power "to regulate Commerce . . . among the Several States . . . ." U.S. Const. art. I, § 8, cl. 3.

## IV

In areas where activities of legitimate local public interest overlap with the national interests expressed by the Commerce Clause, the courts are called upon to make a delicate adjustment of the conflicting state and federal claims, a task which "necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U. S. 429, 441, 98 S. Ct. 787 [,793-794] (1978). From time to time the Supreme Court employed various tests in this process of delicate adjustment,[11] but by the time *Raymond* was decided, experience had taught it that no single conceptual approach identifies all of the factors that may bear on a particular case. *Id.* at 440, [98 S. Ct. at 794]. In the absence of federal attention with respect to subjects

---

11. "*Cooley v. Board of Wardens,* 12 How. 299, 319, 13 L.Ed. 996 (1852), distinguished between subjects 'imperatively demanding a single uniform rule' and subjects "imperatively demanding that diversity, which alone can meet the local necessities.' Other cases have distinguished between state regulations that affect interstate commerce 'directly,' and those that affect it 'indirectly.' *E. g., Hall v. DeCuir,* 95 U.S. 485, 488, 24 L.Ed. 547 (1878); *Smith v. Alabama,* 124 U.S. 465, 482, 8 S.Ct. 564, 571, 31 L.Ed. 508 (1888). And many cases have distinguished between regulations that are an exercise of the State's 'police powers,' and those that are 'regulations of commerce.' *E. g., Railroad Co. v. Fuller,* 17 Wall. 560, 570, 21 L.Ed. 710 (1873); *Smith v. Alabama, supra,* at 482, 8 S. Ct. at 571." Raymond Motor Transp., Inc. v. Rice, 434 U. S. 429, 441 , n. 15, 98 S. Ct. 787 [,794] (1978).

of potential federal regulation under the Commerce Clause, "these subjects are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself." *City of Philadelphia et al. v. State of New Jersey et al.,* 437 U. S. 617, 623, 98 S. Ct. 2531 (1978). "The bounds of these restraints," the Court noted, "appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose," the ultimate principle being "that one state in its dealings with another may not place itself in . a position of economic isolation." *Id.,* quoting *Hood & Sons v. Dumond,* 336 U. S. 525, 538, 69 S. Ct. 657 (1949), which quoted *Baldwin v. Seelig,* 294 U. S. 511, 527, 55 S. Ct. 497 (1935). The Court explained:

> "The opinions of the Court through the years have reflected an alertness to the evils of 'economic isolation' and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected... But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach...." *City of Philadelphia,* 437 U. S. at 623-624.

*Raymond,* 434 U. S. at 441 [98 S. Ct. at 794] and *City of Philadelphia,* 437 U. S. at 624 made clear that the general rule to be followed was that phrased in *Pike v. Bruce Church, Inc.,* 397 U. S. 137, 142, 90 S. Ct. 844 (1970):

> "Where the [state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the

> putative local benefits. *Huron Cement Co. v. Detroit,* 362 U. S. 440, 443 [, 80 S. Ct. 313 (1960)]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

It follows that the crucial inquiry must be directed to determining whether a state law "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia* at 624.

## V

We have before us the constitutionality of § 4-809 (a) and § 4-102 (a). We make the crucial inquiry with regard to those statutes, following the contours outlined in *Pike.*

We have no difficulty in determining that § 4-809 (a) and § 4-102 (a) are not basically a protectionist measure placing the State in a position of economic isolation by a patent discrimination against interstate trade, such as overtly blocking the flow of interstate commerce at the State's borders, thereby effecting a simple economic protectionism so as to invoke a *per se* rule of invalidity. The legislative scheme expressed by the Natural Resources Article is to effectuate conservation of the natural resources of the State, a legitimate local public interest. The laws concerning crabs are a material aspect of this scheme. They are directed to the legitimate local concern and credibly advance the legislative objectives. The Supreme Court has long recognized the authority of a state to promote the preservation of its natural resources. *See Cities Service Co. v. Peerless Co.,* 340 U. S. 179, 187, 71 S. Ct. 215 (1950) (natural gas); *Bayside Fish Co. v. Gentry,* 297 U. S. 422, 426, 56 S. Ct. 513 (1936) (fish and game); *Foster-Fountain Packing Company v. Haydel,* 278 U. S. 1, 11, 49 S. Ct. 1 (1928) (shrimp); *LaCoste v. Dept. of Conservation,*

263 U. S. 545, 549, 44 S. Ct. 186 (1924) (wild animals); *Silz v. Hesterberg,* 211 U. S. 31, 41-43, 29 S. Ct. 10 (1908) (game); *Geer v. Connecticut,* 161 U. S. 519, 522-535, 16 S. Ct. 600 (1896) (birds); *Lawton v. Steele,* 152 U. S. 133, 138, 14 S. Ct. 499 (1894) (fish and game); *Manchester v. Commonwealth of Massachusetts,* 139 U. S. 240, 265, 11 S. Ct. 559 (1891) (fish); *McCready v. Virginia,* 94 U. S. 391, 394-395 (1876) (oysters). *See also* D. Engdahl, Constitutional Power: Federal and State, § 11.07 at 284 (1974).

This Court has upheld the validity of comparable laws in the face of their attack under the Commerce Clause. *Christy v. Clark,* 195 Md. 66, 72 A. 2d 718 (1950) (oyster cull law); *Stevens v. State,* 89 Md. 669, 43 A. 929 (1899) (birds and game). *See Tyler v. State,* 93 Md. 309, 313, 48 A. 840 (1901). We said in *Christy* at 69, citing cases: "It has been universally recognized that such regulation by the State is not prohibited by the Commerce clause." In *Stevens,* we observed: "Many of the States of the Union have passed game laws which include among their provisions a prohibition of the sale or possession of game during the closed season, and these laws have frequently been before both the State and Federal Courts for construction." 89 Md. at 672. "That the total prohibition of having game, from whatever source derived, in possession during the closed season is a reasonable, if not necessary, means of protecting the domestic game of the State making the prohibition, has been held in a number of cases . . . ." *Id.* at 674.[12] And it is not an area in which Congress requires uniformity. *See* 18 U.S.C. 43 (a) (2) and (f) (3) (1976); 16 U.S.C. 667e and 852 (b) (1976). Thus, it is a subject open to control by the states so long as they act within the restraints of the Commerce Clause.

The first of these restraints is that the statute regulate evenhandedly to effectuate the legitimate local public

---

12. Davis suggests that Toomer v. Witsell, 334 U. S. 385, 68 S. Ct. 1156, *reh. denied,* 335 U. S. 837 (1948); Johnson v. Haydel, 278 U. S. 16, 49 S. Ct. 6 (1928) and Foster-Fountain Packing Company v. Haydel, 278 U. S. 1, 49 S. Ct. 1 (1928) lead to a contrary view, but in Christy v. Clark, 195 Md. 66, 69, 72 A. 2d 718 (1950), we expressly found nothing in those cases which was inconsistent with our statement of the law. We noted that they involved unwarranted discrimination against non-residents and were clearly distinguishable.

interest. In other words, it shall not discriminate against interstate commerce.[13] Sections 4-809 (a) and 4-102 (a) regulate evenhandedly and do not discriminate against interstate commerce. They apply equally to residents and non-residents of Maryland. They do not differentiate between crabs caught in Maryland waters and crabs caught elsewhere. They apply whether the crabs are imported into the State or are transported out of the State. They do not prohibit the flow of interstate goods, place added costs upon them, or create any special requirements or restrictions regarding them. They do not protect local suppliers, processers and brokers to the detriment of foreign suppliers, processers and brokers. *See Exxon Corporation et al. v. Governor of Maryland et al.,* 437 U. S. 117, 98 S. Ct. 2207 (1978). All they do is to make unlawful the possession, by any person in Maryland, of the specified number of undersized crabs, except those imported in the closed season. The statutes are simply not discriminatory on their face or in their application.

Of course, the statutes do impose a burden on interstate commerce in that a person shall not have in his possession during the open season more than four undersized hard crabs per bushel or ten per barrel even if they were imported into Maryland. But, as the statutes regulate evenhandedly to effectuate a legitimate local public interest, they are not constitutionally infirm under the Commerce Clause "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . . ." *Pike,* 397 U. S. at 142. Unless the burden imposed is clearly excessive, its effects on interstate commerce are only incidental and provide no ground for invalidity. There being a legitimate local purpose here, the question becomes one of degree, and we must make a delicate adjustment. When we balance that legitimate local concern and national interests expressed by

---

13. *See, e.g.,* City of Philadelphia et al. v. State of New Jersey et al., 437 U. S. 617, 626-627, 98 S. Ct. 2531 (1978); Hunt v. Washington Apple Advertising Comm'n, 432 U. S. 333, 350-354, 97 S. Ct. 2434 (1977); Dean Milk Co. v. Madison, 340 U. S. 349, 354, 71 S. Ct. 295 (1951).

the Commerce Clause, and consider the nature of the local interest involved, the scale tips on the side of the State. We do not find the burden imposed on interstate commerce to be excessive, nor do we see how the local interest could be promoted as well with lesser impact on interstate activities. We believe the impact on interstate activities to be incidental in any event. In *Stevens,* 89 Md. at 674, we asserted:

> "We are . . . well within the authorities in holding that the passage of the Act [therein considered] constituted a valid exercise by the State of power which it clearly possessed, and that its provisions are reasonable for the accomplishment of its purpose, and that its operation upon interstate commerce is of that remote and incidental character which the Supreme Court, in *Geer v. Connecticut, [supra,]* has said does not interfere with the right of a State to protect its game."

It was not material that the game Stevens unlawfully possessed had been lawfully killed in another state and had been shipped to him from that state in an original package, and that he had received and exposed the animals for sale in that condition, without breaking the package. *Id.* at 670.

Other states have determined that there was a sufficient nexus between such regulated conduct and a legitimate state interest to justify the regulation. In *Hjelle v. Brooks,* 377 F. Supp. 430 (D. Alaska, 1974), the nexus proffered by the state was that the regulations were necessary to conserve the crab fishery within the state, relying "on a long line of cases" upholding the constitutionality of certain state statutes regulating fish and wildlife taken beyond a state's territorial limits. The Alaska court examined the cases and determined: "In each, the courts found that it was a valid exercise of police power for states to attempt to conserve fish located in state waters," and that "this power includes the right to prohibit possession of fish taken outside the state. . . . Courts have found the effects of these laws on interstate commerce to be incidental and necessary to prevent possible deception by the fishermen: fishermen might otherwise subvert the

conservation efforts of the states by fishing in state waters but claiming that they took their catch beyond those waters. The inability to distinguish fish taken outside would render enforcement of the state laws difficult at best." *Id.* at 440-441. Similarly, the Maryland legislature plainly was concerned with the enforcement of the conservation laws in that Maryland undersized crabs might be taken under the guise that they were out of state crabs.[14] The line of cases led the Alaska court to conclude that the nexus proffered by the state, "between its legitimate state interests and its regulation of certain extra territorial conduct would pass constitutional muster if its regulations were directed at conserving the crab fishery *within* Alaska's waters by regulating crabbing in that area and, *in order to facilitate enforcement,* by prohibiting the possession of crab in the state during the closed season, even if that crab were caught outside the state." *Id.* at 441 (emphasis in original). *See also, Hjelle v. Brooks,* 424 F. Supp. 595 (D. Alaska, 1976); *State v. Bundrant,* 546 P. 2d 530 (Alaska), *appeal dismissed,* 429 U. S. 806 (1976).

The various state laws regarding game and fish which have been held to be valid have been restrictive in terms of a total prohibition of the catching and possessing of such natural resources or of a prohibition of the catching and possessing of them during a closed season. *See Baldwin v. G.A.F. Seelig,* 294 U. S. 511, 525, 55 S. Ct. 497 (1935). Here, by § 4-809 (e), effective 1 July 1975, the prohibition was the opposite of that in other jurisdictions, being limited to the open season and inapplicable during the closed season. The validity of § 4-809 (e) is not presented in this case. A question as to its constitutionality is not before us, and we do not consider it. Its enactment, of course, did not reflect upon what we have found to be the legislative purpose and intent in the enactment of §§ 4-809 (a) and 4-102 (a). We go no further than

---

14. We observe that there was evidence in the case before us to the effect that the distinction between seaside crabs, which were in the possession of Davis, and "an ordinary Chesapeake Bay crab" could not always be made, even by a department of natural resources officer with 20 years experience in the field.

to observe that, no matter what the reasons may have been for the enactment of the exception or its ultimate aim, its practical effect was to lessen any burden §§ 4-809 (a) and 4-102 (a) imposed on interstate commerce. *Compare City of Philadelphia,* 437 U. S. at 625-626.

The short of it is that we do not find the evil of protectionism in either the legislative ends or the legislative means of §§ 4-809 (a) and 4-102 (a). *See City of Philadelphia,* 437 U. S. at 626. We do find in those statutes a legitimate local public interest, and that, on balance, the statutes do not so unduly burden interstate commerce as to render the legislation unconstitutional under the Commerce Clause. We hold that §§ 4-809(a) and 4-102(a) are constitutional.

# VI

Davis would have us reverse the judgment on the additional ground that § 4-809 (a) was unconstitutionally vague. He urges that a reading of the various sections of title 4 would leave him "with a clear doubt whether the importation of crabs caught in the waters of Virginia and transported in original packages into the State of Maryland had actually been made criminal." He concludes that, as applied to him, § 4-809 (a) "violated his constitutional right of due process of law . . . ."

The answer is that the point is not properly before us because it was not tried and decided below, and is deemed to have been waived. Maryland Rule 885. *See Henry v. State,* 273 Md. 131, 139-140, 328 A. 2d 293 (1974).

In any event, we discussed fully the void-for-vagueness doctrine in *Bowers v. State,* 283 Md. 115, 120-125, 389 A. 2d 341 (1978). We find it manifest that under the basic and universally accepted principles concerning the application of that doctrine, § 4-809(a) is constitutionally sound both on its face and as applied to Davis and meets the requirement of definiteness imposed by due process of law under the Federal

and Maryland Constitutions. A reading of the applicable statutes makes abundantly clear that what Davis did was a crime.

*Judgment affirmed; appellant to pay costs.*