Steve **ANKENY** and Bill Kruse, Appellants–Plaintiffs,

v.

**GOVERNOR OF the STATE OF INDIANA**, Appellee–Respondent.

No. 49A02–0904–CV–353.

Court of Appeals of Indiana.

Nov. 12, 2009.

Rehearing Denied Jan. 15, 2010.

Steve Ankeny, New Castle, IN, Bill Kruse, Roselawn, IN, Appellants pro se.

Gregory F. Zoeller, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

■ Steve Ankeny and Bill Kruse (collectively, "Plaintiffs"), *pro se,* appeal the trial court's grant of a motion to dismiss filed by Mitch Daniels, in his official capacity as the Governor of the State of Indiana ("Governor"). Plaintiffs raise nine issues, which we revise and restate as whether the trial court erred by granting the motion to dismiss under Ind. Trial Rule 12(B)(6).[1] We affirm.[2]

---

1. We note that *pro se* litigants, such as Plaintiffs, "are held to the same standard as licensed lawyers." *Novatny v. Novatny,* 872 N.E.2d 673, 677 n. 3 (Ind.Ct.App.2007). This court will not "indulge in any benevolent presumptions on [their] behalf, or waive any rule for the orderly and proper conduct of [their] appeal." *Foley v. Mannor,* 844 N.E.2d 494, 496 n. 1 (Ind.Ct.App.2006).

Thus, we will attempt to address the issues raised by Plaintiffs. To the extent that Plaintiffs raise additional issues, the Plaintiffs fail to develop a cogent argument and cite to authority. Consequently, the arguments are

The relevant facts follow. On December 9, 2008, Plaintiffs filed a "PETITION FOR EXTRAORDINARY WRIT OF PROHIBITION" against the Governor[3] to prevent the Governor "from issuing a 'Certificate of Ascertainment,' or any other document, to Congress of the United States containing any popular votes for Barack Obama and Joe Biden for the appointment as Chief Electors ... [or] John McCain and Sarah Palin for the appointment of Electors." Appellants' Appendix at 6. On January 30, 2009, the Governor filed a motion to dismiss alleging in part that "the Plaintiffs have failed to state a claim upon which relief can be granted." Appellee's Appendix at 1. The Governor also filed a memorandum in support of the motion to dismiss. On February 17, 2009, the Plaintiffs filed their opposition to the Governor's motion to dismiss. On March 16, 2009, the trial court granted the Governor's motion to dismiss after a hearing.

On April 13, 2009, the Plaintiffs filed their notice of appeal.

■ The sole issue is whether the trial court erred when it dismissed Plaintiffs' complaint. A motion to dismiss for failure to state a claim tests the legal sufficiency of the claim, not the facts supporting it. *General Cas. Ins. Co. v. Bright,* 885 N.E.2d 56, 57 (Ind.Ct.App. 2008) (citing *Charter One Mortg. Corp. v. Condra,* 865 N.E.2d 602, 604 (Ind.2007)). Thus, our review of a trial court's grant or denial of a motion based on Trial Rule 12(B)(6) is de novo. *Id.* at 58. When reviewing a motion to dismiss, we view the pleadings in the light most favorable to the nonmoving party, with every reasonable inference construed in the nonmovant's favor. *Id.* A complaint may not be dismissed for failure to state a claim upon which relief can be granted unless it is clear on the face of the complaint that the complaining party is not entitled to relief.[4]

---

waived. *See, e.g., Loomis v. Ameritech,* 764 N.E.2d 658, 668 (Ind.Ct.App.2002) (holding argument waived for failure to cite authority or provide cogent argument), *reh'g denied, trans. denied.*

2. The trial court also granted the Governor's motion to dismiss on the bases of mootness under Ind. Trial Rule 12(B)(1) and the equitable doctrine of laches. Because we find that Plaintiffs failed to state a claim upon which relief can be granted under T.R. 12(B)(6), we need not address the trial court's alternative grounds for dismissal.

3. The Complaint also named the Democratic National Committee, Barack Obama, the Republican National Committee, and John McCain as defendants. The Plaintiffs state, without citation to the record, that "only the Governor of the State of Indiana accepted Service of Summons." Appellants' Brief at 3. We note that the Plaintiffs' case summary lists only the Governor as appellee, the Plaintiffs' notice of appeal lists only the Governor as defendant, and the Plaintiffs' briefs contain certificates of service indicating that the briefs were served upon only the Governor.

4. In his brief, the Governor argues that the motion to dismiss included an affidavit, and therefore because "matters outside the pleadings [were] presented to the court on a 12(B)(6) motion, the motion shall be treated as one for summary judgment under T.R. 56. T.R. 12(B)." Appellee's Brief at 6. While true that the general rule is that when a motion to dismiss for failure to state a claim under T.R. 12(B)(6) is supplemented with materials outside the pleadings it should be treated as a motion for summary judgment, we note that:

> [W]hen examination of the face of a complaint alone reveals that the plaintiff will not be entitled to relief under any set of circumstances, consideration of external materials aimed at substantiating or contradicting the complaint's factual allegations is irrelevant, because *a fortiori* the complaint fails to state a claim upon which relief can be granted under any factual scenario. In that instance, the trial court should exclude material outside the pleadings which are submitted with a 12(B)(6) motion, rather than convert the motion into one for summary judgment, because the external material are irrelevant to the motion.

*Id.* However, a court need not accept as true any "conclusory, non-factual assertions or legal conclusions." *Irish v. Woods,* 864 N.E.2d 1117, 1120 (Ind.Ct.App. 2007). "Thus, while we do not test the sufficiency of the facts alleged with regards to their adequacy to provide recovery, we do test their sufficiency with regards to whether or not they have stated some factual scenario in which a legally actionable injury has occurred." *Trail v. Boys and Girls Clubs of Northwest Indiana,* 845 N.E.2d 130, 134 (Ind.2006).

In their complaint, the Plaintiffs appear to suggest that the Governor has a duty to determine a person's eligibility to become President in issuing the "Certificate of Ascertainment" "officially appoint[ing] the electors" who cast the State of Indiana's votes in the Electoral College, the body which decides the election for the President of the United States ("President"). Transcript at 13. Specifically, Plaintiffs appear to argue that the Governor did not comply with this duty because: (A) neither President Barack Obama nor Senator John McCain were eligible "to be appointed 'Elector in Chief' in violation of Article II, Section 1, Clause 2's prohibition that no United States Senator currently holding that office shall be appointed Elector for any State," and (B) neither President Barack Obama nor Senator John McCain were eligible to hold the office of President because neither were "born naturally within any Article IV State of the 50 United States of America...." Appellants' Appendix at 11–12, 16–18.

Initially, we note that the Plaintiffs do not cite to any authority recognizing that the Governor has a duty to determine the eligibility of a party's nominee for the presidency. The Plaintiffs do not cite to authority, nor do they develop a cogent legal argument stating that a certificate of ascertainment has any relation to the eligibility of the candidates. However, we note that even if the Governor does have such a duty, for the reasons below we cannot say that President Barack Obama or Senator John McCain was not eligible to become President. We will handle each of Plaintiffs' arguments in turn.

## A. *Sitting Senator*

■ First, Plaintiffs argue that "[t]he Constitution of the United States enumerates qualification for the Office of Presidential and Vice–Presidential Electors, and no 'sitting Senator,' such as Senator Barack Obama and Senator Joseph Biden, or Senator John McCain, was qualified." Appellants' Brief at 8. We hold for the reasons stated below that Plaintiffs failed to state a cognizable legal claim upon which relief can be granted.

In evaluating Plaintiffs' claim, one need not go further than compare their framing of the electoral process in the State of Indiana with Indiana's electoral process as constructed by state and federal statute, and indeed by the U.S. Constitution itself. Article II, Section 1 of the U.S. Constitution sets forth how the President is chosen; the mechanism used is called the

*Dixon v. Siwy,* 661 N.E.2d 600, 603 (Ind.Ct. App.1996). In this case, there is no evidence that the trial court considered the material contained in the affidavit prepared by J. Bradley King, Co–Director for the Indiana Election Division, which contains nine paragraphs explaining the vote-tallying process actually carried out following the November 4, 2008 election. The affidavit was not relevant to the trial court's order granting the Governor's motion to dismiss. Thus, it was proper for the trial court to exclude this affidavit and handle the Governor's motion as a motion to dismiss for failure to state a claim rather than one for summary judgment. *See Trail v. Boys and Girls Clubs of Northwest Indiana,* 845 N.E.2d 130, 134, 140 (Ind.2006) (affirming the trial court's grant of a motion to dismiss under Rule 12(B)(6) even after the parties "filed several affidavits, exhibits, and briefs").

Electoral College. *See* 3 U.S.C. § 4. Article II, Section 1 describes how the Electoral College is filled as follows:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

U.S. CONST. art. II, § 1, cl. 2. Much of the rest of Article II, Section 1 was changed by the Twelfth Amendment which was ratified in June 1804. The Twelfth Amendment directs:

> The Electors shall meet in their respective states, and vote by ballot for President . . . and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President . . .

U.S. CONST. amend. XII.

■ Thus, the U.S. Constitution vests in the various state legislatures the authority to determine how their state chooses their Electors. The Indiana Legislature acted on this authority when it enacted Ind.Code § 3–10–4–4, which allows voter ballots to carry the name of the "nominees for President and Vice President of the United States of a political party," and that such votes for each nominee "is a vote cast or registered for all of the candidates for presidential electors of the party. . . ." By virtue of its nine members of the House of Representatives and its two Senators, Indiana was entitled to eleven electors in the November 4, 2008 election.[5] Both the Democratic and Republican party nominated eleven individuals who were residents of the State of Indiana to serve as their party's electors in the 2008 presidential election.[6] *See* Ind.Code § 3–8–4–2 ("[a] political party shall conduct a state convention to . . . nominate candidates for presidential electors and alternate electors . . . ."); *see also* Appellants' Appendix at 21–22. Neither President Barack Obama nor Senator John McCain were nominated as electors for their respective parties in the 2008 election. Appellants' Appendix at 21–22.

"Not later than noon on the second Monday following an election, each circuit court clerk shall prepare a certified state-

---

**5.** The date of the election was chosen pursuant to Ind.Code § 3–10–2–1, which states that "[a] general election shall be held on the first Tuesday after the first Monday in November in each even-numbered year. . . ."

**6.** The Democratic Party's candidates for Indiana electors were: (1) Jeffrey L. Chidester, of Valparaiso; (2) Owen "Butch" Morgan, of South Bend; (3) Michelle Boxell, of Warsaw; (4) Charlotte Martin, of Indianapolis; (5) Jerry J. Lux, of Shelbyville; (6) Connie Southworth, of Salamonia; (7) Alan P. Hogan, of Indianapolis; (8) Myrna E. Brown, of Vincennes; (9) Clarence Benjamin Leatherbury, of Salem; (10) Daniel J. Parker, of Indianapolis; and (11) Cordelia Lewis Burks, of Indianapolis. The Republican Party's candidates for Indiana electors were: (1) Chuck Williams, of Valparaiso; (2) Edward Smith, of Galveston; (3) Barbara Krisher, of Fort Wayne; (4) Daniel Bortner, of Bedford; (5) Virginia Marner, of Kokomo; (6) Susan Lightle, of Greenfield; (7) Pearl Swanigan, of Indianapolis; (8) William Springer, of Sullivan; (9) David Buskill, of Jeffersonville; (10) Samual Wayne Goodman, of Greenwood; and (11) Juana Watson, of Columbus. Appellants' Appendix at 21–22; *see also* 2008 Presidential Elector Candidates, *available at* http://www.in.gov/sos/elections/files/2008_Presidential_Elector_Candidate_List.pdf (last visited Oct. 8, 2009).

ment ... of votes received by each candidate for: (1) federal office...." Ind.Code § 3–12–5–6(a). These certified statements are sent to the election division of the Secretary of State. Ind.Code § 3–12–5–6(b). Once the election results have been tabulated, "not later than noon of the last Tuesday in November," the Secretary of State "shall certify to the governor the candidate receiving the highest number of votes for each office." Ind.Code § 3–12–5–7. The Governor must then execute a certificate of ascertainment which officially appoints the winning presidential electors; a copy of the certificate of ascertainment is then sent to the Archivist of the United States.[7] 3 U.S.C. § 6.

The presidential electors assemble "in the chamber of the Indiana house of representatives on the first Monday after the second Wednesday in December as provided by 3 U.S.C. 7, or on another day fixed by the Congress of the United States, at 10 a.m. to elect the President and Vice–President of the United States." Ind.Code § 3–10–4–7. The electors then furnish copies of the "certificates so made by them and the lists attached thereto"[8] to the Vice President, the Indiana Secretary of State, the Archivist of the United States, and "judge of the district in which the electors shall have assembled." 3 U.S.C. § 11. The votes of the electors of each state are then tallied by the Congress of the United States and the new President is announced. 3 U.S.C. § 15.

The Plaintiffs have a different view of the electoral process in the State of Indiana. In their complaint, the Plaintiffs allege that:

By allowing the name of Barack Obama upon the ballot for appointment of Electors, the Governor of the State of Indiana has allowed Barack Obama to be appointed "Elector in Chief" in violation of Article II, Section 1, Clause 2's prohibition that no United States Senator currently holding that office shall be appointed Elector for any State.

Appellants' Appendix at 16. The Plaintiffs make a similar charge against Senator John McCain's name appearing on the ballot. In essence, Plaintiffs argue that because President Barack Obama and Senator John McCain were United States Senators on November 4, 2008, they were constitutionally ineligible to be appointed as presidential elector (or, as Plaintiffs put it, "Elector in Chief").

Plaintiffs do not state a meritorious claim. Notwithstanding the fact that it is unclear what Plaintiffs are referring to by the phrase "Elector in Chief," Plaintiffs' characterization of the electoral process in the State of Indiana simply is not consistent with the applicable laws. The fact that the names "Barack Obama" and "John McCain" are the ones that appeared on the ballot does not change the fact that they were in fact *candidates* for the presidency, not any of Indiana's electors.

This distinction between a candidate and an elector is readily ascertainable throughout Title 3 of the Indiana Code. As an example, we examine Ind.Code § 3–8–1–6, titled "President or Vice President; electors." That code section states:

(a) A candidate for the office of President or Vice President of the United States must have the qualifications provided in Article 2, Section 1, clause 4 of the Constitution of the United States.

---

7. The Archivist of the United States transmits copies "to the two Houses of Congress ... of each and every such certificate so received...." 3 U.S.C. § 6.

8. The electors prepare the certificates in accordance with 3 U.S.C. §§ 6, 9–11.

(b) A candidate for the office of *elector* for President and Vice President of the United States must have the qualifications provided in Article 2, Section 1, clause 2 of the Constitution of the United States and Section 3 of the Fourteenth Amendment to the Constitution of the United States.

Ind.Code § 3–8–1–6 (emphasis added). Thus, Ind.Code § 3–8–1–6 expresses a dichotomy between the presidential and vice-presidential nominees and the slate of electors appointed by each political party to serve in the Electoral College. *See also* Ind.Code § 3–10–4–1 (stating that the names of the "electors of President and Vice President of the United States may not be placed on the ballot," but that "[t]he names of the nominees for President and Vice President of the United States ... shall be placed ... on the ballot ...").

Thus, we conclude that Plaintiffs' argument that the Governor has allowed President Barack Obama and Senator John McCain to be appointed "Elector in Chief" in violation of Article II, Section 1, Clause 2's prohibition against sitting Senators being appointed Elector for any State fails to state a claim upon which relief can be granted.

**B.  *Natural Born Citizen***

██ Second, the Plaintiffs argue that both President Barack Obama and Senator John McCain are not "natural born Citizens" as required for qualification to be President under Article II, Section 1, Clause 4[9] of the U.S. Constitution, and that therefore because neither person was constitutionally eligible to become President, "[t]he Governor ... should [have been] prohibited by order of [the trial court] ... from issuing any certificate of ascertainment, or any other certified statement, under the State Seal of the State of Indiana...." Appellants' Appendix at 13.

Before addressing the Plaintiffs' specific arguments, we think it helpful to point out the context in which this claim arises. Leading up to the 2008 Presidential Election and in the ensuing months after, a number of lawsuits were filed nationwide challenging both President Barack Obama and Senator John McCain's[10] status as "natural born Citizens" under Article II of the U.S. Constitution. *See, e.g., Berg v. Obama*, 574 F.Supp.2d 509 (E.D.Pa.2008);

**9.** The Plaintiffs cite the "natural born Citizen" clause as Article II, Section 1, Clause 5 of the U.S. Constitution, but it is properly cited as Article II, Section 1, Clause 4. *See also* Ind.Code § 3–8–1–6.

**10.** The United States Senate passed a resolution on April 30, 2008 which explicitly recognized Senator John McCain as a natural born citizen. S.J. Res. 511, 110th Cong. (2008). Also, the supposed authority cited by the Plaintiffs to support their claim as to the meaning of Article II, Section 1, Clause 4 of the U.S. Constitution does not support the argument that John McCain is not a natural born citizen. Plaintiffs state in their brief that the difference between being a "citizen of the United States" and a "natural born Citizen" "involves having [two] parents of U.S. Citizenship, owing no foreign allegiance." Appellant's Brief at 23. The Plaintiffs then concede that "John McCain ... qualifie[s] as a 'citizen of the United States,' by being born of [two] parents who were in turn 'citizens of the United States,' and owed no foreign allegiance...." *Id.* Their brief continues that "John McCain was born 'subject to the jurisdiction' of the United States, but he was not born in one of the 50 States of the Union under Article IV of the Constitution, and thus ... was not a 'natural born Citizen....'" *Id.* at 23–24. Plaintiffs do not cite to any authority or develop any cogent legal argument for the proposition that a person must actually be born within one of the fifty States in order to qualify as a natural born citizen, and we therefore do not address Plaintiffs argument as it relates to Senator McCain. *See Loomis*, 764 N.E.2d at 668.

*Hollander v. McCain,* 566 F.Supp.2d 63 (D.N.H.2008); *Cohen v. Obama,* No. 08–2150, 2008 WL 5191864 (D.D.C. Dec.11, 2008), *aff'd by* 332 Fed.Appx. 640, 2009 WL 2870668 (D.C.Cir. Sept.8, 2009); *Wrotnowski v. Bysiewicz,* 289 Conn. 522, 958 A.2d 709 (2008). As to President Obama's status, the most common argument has been waged by members of the so-called "birther" movement who suggest that the President was not born in the United States; they support their argument by pointing to "the President's alleged refusal to disclose publicly an 'official birth certificate' that is satisfactory to [the birthers]." *Rhodes v. MacDonald,* No. 409–CV–106CDL, 2009 WL 2997605, at *1 (M.D.Ga. Sept. 16, 2009), *reconsideration denied by* 2009 WL 3111834 (M.D.Ga. Sept. 18, 2009).

The Plaintiffs in the instant case make a different legal argument based strictly on constitutional interpretation. Specifically, the crux of the Plaintiffs' argument is that "[c]ontrary to the thinking of most People on the subject, there's a very clear distinction between a 'citizen of the United States' and a 'natural born Citizen,' and the difference involves having [two] parents of U.S. citizenship, owing no foreign allegiance." Appellants' Brief at 23. With regard to President Barack Obama, the Plaintiffs posit that because his father was a citizen of the United Kingdom, President Obama is constitutionally ineligible to assume the Office of the President.

The bases of the Plaintiffs' arguments come from such sources as FactCheck.org, The Rocky Mountain News, an eighteenth century treatise by Emmerich de Vattel titled "The Law of Nations," and various citations to nineteenth century congressional debate.[11] For the reasons stated below, we hold that the Plaintiffs' argu-

ments fail to state a claim upon which relief can be granted, and that therefore the trial court did not err in dismissing the Plaintiffs' complaint.

Section 1 of the Fourteenth Amendment to the U.S. Constitution governs who is a citizen of the United States. It provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States...." U.S. CONST. amend XIV, § 1. Article II has a special requirement to assume the Presidency: that the person be a "natural born Citizen." U.S. CONST. art. II, § 1, cl. 4. The United States Supreme Court has read these two provisions in tandem and held that "[t]hus new citizens may be born or they may be created by naturalization." *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 167, 22 L.Ed. 627 (1874). In *Minor,* written only six years after the Fourteenth Amendment was ratified, the Court observed that:

> The Constitution does not, in words, say who shall be natural-born citizens. Resort must be had elsewhere to ascertain that. At common-law, with the nomenclature of which the framers of the Constitution were familiar, it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. Some authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents. As to this class there have been doubts, but never as to the first. For the purposes of this case it is not necessary to solve these doubts.

11. Plaintiffs do not provide pinpoint citations to the congressional debate quotations to

which they cite.

*Id.* at 167–168, 22 L.Ed. 627. Thus, the Court left open the issue of whether a person who is born within the United States of alien parents is considered a natural born citizen.[12]

Then, in *U.S. v. Wong Kim Ark*, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898), the United States Supreme Court confronted the question of "whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subject to the emperor of China ... becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment...." 169 U.S. at 653, 18 S.Ct. at 458. We find this case instructive. The Court in *Wong Kim Ark* reaffirmed *Minor* in that the meaning of the words "citizen of the United States" and "natural-born citizen of the United States" "must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution." *Id.* at 654, 18 S.Ct. at 459. They noted that "[t]he interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *Id.* at 655, 18 S.Ct. at 459 (quoting *Smith v. Alabama*, 124 U.S. 465, 478, 8 S.Ct. 564, 569, 31 L.Ed. 508 (1888)). The *Wong Kim Ark* Court explained:

> The fundamental principle of the common law with regard to English nationality was birth within the allegiance-also called 'ligealty,' 'obedience,' 'faith,' or 'power'-of the king. The principle embraced all persons born within the king's allegiance, and subject to his protection.

Such allegiance and protection were mutual,-as expressed in the maxim, 'Protectio trahit subjectionem, et subjectio protectionem,'-and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the kingdom. Children, born in England, of such aliens, were therefore natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king.

This fundamental principle, with these qualifications or explanations of it, was clearly, though quaintly, stated in the leading case known as 'Calvin's Case,' or the 'Case of the Postnati,' decided in 1608, after a hearing in the exchequer chamber before the lord chancellor and all the judges of England, and reported by Lord Coke and by Lord Ellesmere. Calvin's Case, 7 Coke, 1, 4b–6a, 18a, 18b; Ellesmere, Postnati, 62–64; s. c. 2 How. St. Tr. 559, 607, 613–617, 639, 640, 659, 679.

The English authorities ever since are to the like effect. Co. Litt. 8a, 128b; Lord Hale, in Harg. Law Tracts, 210, and in 1 Hale, P.C. 61, 62; 1 Bl. Comm. 366, 369, 370, 374; 4 Bl. Comm. 74, 92; Lord Kenyon, in *Doe v. Jones*, 4 Term R. 300, 308; Cockb. Nat. 7; Dicey, Confl. Laws, pp. 173–177, 741.

---

**12.** Note that the Court in *Minor* contemplates only scenarios where both parents are either citizens or aliens, rather in the case of President Obama, whose mother was a U.S. citizen and father was a citizen of the United Kingdom.

\*   \*   \*   \*   \*   \*

Lord Chief Justice Cockburn ... said: 'By the common law of England, every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject, save only the children of foreign ambassadors (who were excepted because their fathers carried their own nationality with them), or a child born to a foreigner during the hostile occupation of any part of the territories of England. No effect appears to have been given to descent as a source of nationality.' Cockb. Nat. 7.

Mr. Dicey, in his careful and thoughtful Digest of the Law of England with Reference to the Conflict of Laws, published in 1896, states the following propositions, his principal rules being printed below in italics: *"British subject'* *means any person who owes permanent* *allegiance to the crown.* 'Permanent' allegiance is used to distinguish the allegiance of a British subject from the allegiance of an alien, who, because he is within the British dominions, owes 'temporary' allegiance to the crown. *'Natu-* *ral-born British subject' means a Brit-* *ish subject who has become a British* *subject at the moment of his birth.'* *'Subject to the exceptions hereinafter* *mentioned, any person who (whatever* *the nationality of his parents) is born* *within the British dominions is a natu-* *ral-born British subject.* This rule contains the leading principle of English law on the subject of British nationality.' The exceptions afterwards mentioned by Mr. Dicey are only these two: '(1) Any person who (his father being an alien enemy) is born in a part of the British dominions, which at the time of such person's birth is in hostile occupation, is an alien.' '(2) Any person whose father (being an alien) is at the time of such person's birth an ambassador or other diplomatic agent accredited to the crown by the sovereign of a foreign state is (though born within the British dominions) an alien.' And he adds: 'The exceptional and unimportant instances in which birth within the British dominions does not of itself confer British nationality are due to the fact that, though at common law nationality or allegiance in substance depended on the place of a person's birth, it in theory at least depended, not upon the locality of a man's birth, but upon his being born within the jurisdiction and allegiance of the king of England; and it might occasionally happen that a person was born within the dominions without being born within the allegiance, or, in other words, under the protection and control of the crown.' Dicey, Confl. Laws, pp. 173–177, 741.

It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born.

III. The same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally estab-

lished.[13]

*Id.* at 655–658, 18 S.Ct. at 459–460.

Also, as quoted in *Wong Kim Ark*, Justice Joseph Story once declared in *Inglis v. Trustees of Sailors' Snug Harbor*, 28 U.S. (3 Pet.) 99, 7 L.Ed. 617 (1830), that "Nothing is better settled at the common law than the doctrine that the children, even of aliens, born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660, 18 S.Ct. at 461 (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., concurring)). The Court also cited Justice Curtis's dissent in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856):

The first section of the second article of the constitution uses the language, 'a natural-born citizen.' It thus assumes that citizenship may be acquired by birth. Undoubtedly, this language of the constitution was used in reference to that principle of public law, well understood in this country at the time of the adoption of the constitution, which referred citizenship to the place of birth.

*Wong Kim Ark*, 169 U.S. at 662, 18 S.Ct. at 462 (quoting *Dred Scott*, 60 U.S. (19 How.) at 576 (Curtis, J., dissenting)).

The Court in *Wong Kim Ark* also cited authority which notes that:

All persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. We find no warrant for the opinion that this great principle of the common law has ever been changed in the United States. It has always obtained here with the same vigor, and subject only to the same exceptions, since as before the Revolution.

*Id.* at 662–663, 18 S.Ct. at 462 (quotations and citations omitted). The Court held that Mr. Wong Kim Ark was a citizen of the United States "at the time of his birth." [14] *Id.* at 705, 18 S.Ct. at 478.

Based upon the language of Article II, Section 1, Clause 4 and the guidance provided by *Wong Kim Ark*, we conclude that persons born within the borders of the United States are "natural born Citizens" for Article II, Section 1 purposes, regardless of the citizenship of their parents. Just as a person "born within the British dominions [was] a natural-born British subject" at the time of the framing of the U.S. Constitution, so too were those "born in the allegiance of the United States [ ] natural-born citizens." [15]

13. According to Westlaw, *Wong Kim Ark* has been cited to in over 1,000 cases.

14. We note the fact that the Court in *Wong Kim Ark* did not actually pronounce the plaintiff a "natural born Citizen" using the Constitution's Article II language is immaterial. For all but forty-four people in our nation's history (the forty-four Presidents), the dichotomy between who is a natural born citizen and who is a naturalized citizen under the Fourteenth Amendment is irrelevant. The issue addressed in *Wong Kim Ark* was whether Mr. Wong Kim Ark was a citizen of the United States on the basis that he was born in the United States. *Wong Kim Ark*, 169 U.S. at 705, 18 S.Ct. at 478.

15. We reiterate that we do not address the question of natural born citizen status for persons who became United States citizens at birth by virtue of being born of United States citizen parents, despite the fact that they were born abroad. That question was not properly presented to this court. Without addressing the question, however, we note that nothing in our opinion today should be understood to hold that being born within the fifty United States is the *only* way one can receive natural born citizen status.

The Plaintiffs do not mention the above United States Supreme Court authority in their complaint or brief; they primarily rely instead on an eighteenth century treatise and quotations of Members of Congress made during the nineteenth century. To the extent that these authorities conflict with the United States Supreme Court's interpretation of what it means to be a natural born citizen, we believe that the Plaintiffs' arguments fall under the category of "conclusory, non-factual assertions or legal conclusions" that we need not accept as true when reviewing the grant of a motion to dismiss for failure to state a claim. *Irish,* 864 N.E.2d at 1120. Thus, we cannot say that the trial court erred when it dismissed the Plaintiffs' case.[16] *See generally McCalment v. Eli Lilly & Co.,* 860 N.E.2d 884 (Ind.Ct.App. 2007) (holding that the plaintiffs' arguments had been sufficiently addressed by Indiana Supreme Court precedent and therefore the trial court did not err when it granted the defendant's motion to dismiss for failure to state a claim upon which relief can be granted); *see also, e.g., Diaz–Salazar v. I.N.S.,* 700 F.2d 1156, 1160 (7th Cir.1983) (noting in its recitation of the facts that despite the fact father was not a citizen of the United States, he had children who were "natural-born citizens of the United States"), *cert. denied* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983).

For the foregoing reasons, we affirm the trial court's grant of the Governor's motion to dismiss.

Affirmed.

CRONE, J., and MAY, J., concur.

16. We note that President Obama is not the first U.S. President born of parents of differing citizenship. Chester A. Arthur, the twenty-first U.S. President, was born of a mother who was a United States citizen and a father who was an Irish citizen. *See* THOMAS C. REEVES, GENTLEMAN BOSS, THE LIFE OF CHESTER ALAN ARTHUR 3–4 (1975). During the election of 1880, there arose a rumor "that [Arthur] had been born in Canada, rather than in Vermont as he claimed, and was thus constitutionally ineligible to become the Chief Executive." *Id.* at 3. Although President Arthur's status as a natural born citizen was challenged in the 1880 Presidential Election on the grounds that he was born in Canada rather than Vermont, the argument was not made that because Arthur's father was an Irish citizen he was constitutionally ineligible to be President. *See generally id.*