**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANTS:

**ERIC S. PAVLACK**
**COLIN E. FLORA**
Pavlack Law, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**ANTHONY W. OVERHOLT**
**SARAH STEELE RIORDAN**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

FILED
Apr 25 2013, 9:33 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JESSICA and GERSON URBINA, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 06A01-1210-CT-464 |
| | ) | |
| TINA KLINKOSE-KYLER, LARONDA | ) | |
| SOUTHWORTH, and A BOND OF LIFE | ) | |
| ADOPTIONS, LLC, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE BOONE SUPERIOR COURT
The Honorable Matthew C. Kincaid, Judge
Cause No. 06D01-1206-CT-384

**April 25, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Jessica and Gerson Urbina engaged the services of A Bond of Life Adoptions, LLC (ABLA) to assist them in their efforts to adopt a child. Ultimately, a prospective match was found with the unborn child of a woman in Indiana and things progressed to the point that the child was born. Several days after the child was born, and before the child left the hospital, the Urbinas were informed that the child might be addicted to drugs by virtue of the birth mother's drug use during pregnancy. The Urbinas learned at the same time this information had been conveyed to ABLA several days before. Upon learning of the possibility of drug dependency, the Urbinas withdrew from the adoption process and filed the present lawsuit against ABLA, alleging multiple theories of recovery. ABLA filed a motion to dismiss under Ind. Trial Rule 12(B)(6). The Urbinas appeal from the granting of ABLA's motion, presenting the following consolidated and restated issues for review:

1. Taking all factual allegations in the Urbinas' complaint as true and drawing all reasonable inferences in their favor for purposes of a motion to dismiss under T.R. 12(B)(6), did the trial court err in concluding that the Urbinas would not be able to establish under any set of facts admissible under the allegations of their complaint that ABLA breached a duty to divulge to the Urbinas the substance of the phone call advising ABLA that the baby might be suffering from chemical withdrawal?

2. Did the Urbinas contractually release any claim of breach of fiduciary duty based upon the operative facts in this case?

3. Did the allegations in the Urbinas' complaint state a claim for intentional infliction of emotional distress such that dismissal under T.R. 12(B)(6) is inappropriate?

We reverse and remand with instructions.

As we will explain below, in addressing this appeal, we will take as true the facts

2

alleged in the Urbinas' complaint. Pursuant to this version of the facts, the Urbinas, residents of Canada, decided to adopt a child and employed ABLA, an adoption agency, to aid in this endeavor. The contractual agreement entered into by the parties, which set forth the terms by which their mutual endeavor would be governed, was denominated "Agency Agreement" (the Agreement). *Appellants' Appendix* at 19. During the adoption screening and matching processes, the Urbinas "indicated to [ABLA] in writing and verbally that under no circumstances were they interested in being matched with a prospective birthmother who was abusing narcotics, alcohol, or other drugs." *Id*. at 3. The Urbinas were matched with a prospective birth mother in Noblesville, Indiana. On February 2, 2012, the Urbinas were notified that the birth mother had gone to the hospital for the purpose of inducing labor. On the morning of February 3, Jessica flew to Chicago and then drove to a hospital near Indianapolis, where the child was born.[1] At 8:30 a.m. on February 3, "a social worker involved in the adoption" informed ABLA that the baby was being monitored for withdrawal caused by the birth mother's methadone use during pregnancy. *Id*. at 9. When ABLA personnel met Jessica at the hospital upon her arrival, they did not inform her of the information communicated in the social worker's call.[2]

---

[1] The complaint alleges that Jessica's flight landed in Chicago at 10:30 a.m. and then she drove three and one-half hours to the hospital, where she arrived at – 10:30 a.m. Obviously, at least one of these factual allegations cannot be true. For purposes of the issues under consideration in this appeal, however, the inaccuracy will not impact our analysis.

[2] In their appellate brief, the Urbinas phrase it thus: "[W]hen Jessica arrived at the hospital on February 3 at approximately 10:30 a.m., she interacted with [ABLA], who behaved as if everything was perfectly fine." *Id.* at 9. When considered in the context of other factual allegations in the Urbinas' complaint, we interpret this rather hyperbolic turn-of-phrase to mean that ABLA did not divulge the contents of the call at this early juncture.

From the time of her arrival on Friday morning, Jessica, and later Gerson, spent time with the baby, chose a name, and emailed photos of the baby to their friends, family, and co-workers. "During this time, the baby exhibited behavior such as extreme and jerky reaction to touch, extreme hunger, and unusually frequent bowel movements[.]" *Id*. at 10. On Monday morning, the Urbinas learned for the first time that the birth mother used methadone during her pregnancy and that the baby was experiencing withdrawal. This information was conveyed in a phone call from a social worker, who also informed the Urbinas "that the possibility of the birthmother's withdrawal had been discussed with [ABLA] on the morning of February 3",[3] before Jessica first met the baby. *Id*. at 11.

This new information was apparently a game-changer for the Urbinas. In light of their subsequent claim for intentional infliction of emotional distress, we think it appropriate to quote from the complaint the Urbinas' own description of their response to the information:

> Having spent three days bonding with [the] baby[] and thinking they were finally parents, the Urbinas were forced to make the gut-wrenching decision of whether to keep the baby. Following 24 hours of agonizing, the Urbinas made the most difficult decision of their lives, and decided that [the] baby [] would be better off with adoptive parents who were better equipped to deal with her possible special needs caused by her mother's addiction.

*Id*.

On April 17, 2012, the Urbinas filed a six-count complaint for damages alleging: Count I – breach of contract; Count II – breach of fiduciary duty; Count III – negligence;

---

[3]  We presume the Urbinas here meant to reference either the mother's *drug use* or the *baby's* withdrawal, or perhaps both, because the birth mother's withdrawal symptoms would be irrelevant to this appeal. Moreover, the complaint does not allege that ABLA was apprised of the possibility of the *birth mother* experiencing withdrawal symptoms.

Count IV – gross negligence; Count V – common-law fraud/fraudulent misrepresentation; and Count VI – intentional infliction of emotional distress. On August 7, 2012, ABLA filed a T.R. 12(B)(6) motion to dismiss the Urbinas' complaint and a memorandum in support thereof. The Urbinas filed their response on August 17, 2012. On September 24, 2012, trial court entered the following order granting ABLA's motion to dismiss:

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Defendants Tina Klincose-Kyler, Laronda Southworth, and A Bond of Life Adoptions, LLC ("ABL"), having filed their Motion to Dismiss and the Court being so advised finds that such request should be granted.

IT IS HEREBY ORDERED THAT Defendants' Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

This dismissal is without prejudice.

*Appellants' Brief* at 32.

Before we address the individual questions presented in this appeal, we observe that the procedural posture in which this case arrives is of particular significance in leading us to the conclusions we have reached. Accordingly, we will begin there. This case was resolved below by dismissal of the complaint on T.R. 12(B)(6) grounds.[4] T.R. 12 authorizes litigants to present certain defenses by motion. One such defense is set out in subsection 12(B)(6), which authorizes dismissal of a complaint for "[f]ailure to state a claim upon which relief can

---

[4] We are compelled here to take the parties' word for it that ABLA's motion to dismiss was premised upon this basis. The appellate appendix contains essentially only two documents: the complaint, and a copy of the Agreement. We therefore are not privy to the substance of ABLA's motion. the trial court's order granting the motion did not articulate the court's reasoning.

5

be granted, which shall include failure to name the real party in interest under Rule 17." A motion to dismiss submitted on this basis challenges the legal sufficiency of a complaint. *Meyers v. Meyers*, 861 N.E.2d 704 (Ind. 2007).

When ruling upon a T.R. 12(B)(6) motion to dismiss, "'a court is required to take as true all allegations upon the face of the complaint and may only dismiss if the plaintiff would not be entitled to recover under any set of facts admissible under the allegations of the complaint.'" *Id*. at 705 (quoting *Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806, 814 (Ind. 2004)). When reviewing a ruling on such motions, we draw all reasonable inferences in favor of the nonmoving party, in this case, the Urbinas. *Meyers v. Meyers*, 861 N.E.2d 704. Our review of a trial court's grant or denial of a T.R. 12(B)(6) motion is de novo. *Ankeny v. Governor of State of Ind.*, 916 N.E.2d 678 (Ind. Ct. App. 2009), *trans. denied*. With these principles in mind, and stressing that we are bound to take as true the allegations in the complaint, we proceed to an examination of the issues.

1.

The Urbinas' complaint for damages alleged six separate theories of recovery, three of which include the element of "duty." Those are: under Count II – breach of fiduciary duty; Count III – negligence; and Count IV – gross negligence. The Urbinas identify three separate bases for the existence of a duty. The first is that "ABLA assumed a duty to disclose all information regarding the health of the child." *Appellants' Brief* at 14. The short argument offered in support of this assertion makes it clear that this argument is premised upon the Agreement. That is, the duty arose as a result of the relationship established in the

6

contract between ABLA and the Urbinas. According to the Urbinas, the second source of a duty was the fact that ABLA "was the agent of the Urbinas and thus had a duty to act with good faith." *Id*. Third, the Urbinas claim ABLA owed them a fiduciary duty.

It seems to us that all three bases share a common origin – i.e., the Agreement. That is, ABLA's duty to immediately divulge to the Urbinas what the social worker told ABLA on the morning of February 3, ultimately arose because of the contractual relationship between ABLA and the Urbinas. We need not address each argument – or basis – separately, but instead conclude that the viability of each argument depends upon a common source – the Agreement – which was the contract that governed the parties' relationship. Therefore, we must look to the Agreement to determine whether it may fairly be construed so as to impose such a duty. Rephrased in terms of our standard of review, we must decide whether the Urbinas would be entitled to establish under any set of facts admissible under the allegations of the complaint that the Agreement imposed upon ABLA a duty to divulge the contents of the social worker's call at some point between the time ABLA was apprised of it and when the Urbinas discovered independently that the infant might be suffering from chemical withdrawal.

The construction of the terms of a written contract is a pure question of law, therefore we review de novo a trial court's conclusions in this regard. *Green Tree Servicing, LLC v. Brough,* 930 N.E.2d 1238 (Ind. Ct. App. 2010). We attempt to determine the parties' intent at the time the contract was made, and do so by examining the language the parties used to express their rights and duties. *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211 (Ind. Ct. App.

7

2009), *trans. denied*.  When interpreting a contract, we give the language of the contract its plain and ordinary meaning. *Green Tree Servicing, LLC v. Brough,* 930 N.E.2d 1238.  If a contract is ambiguous or its meaning uncertain, its construction is a matter for the fact-finder. *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211.  We read the contract as a whole when determining the parties' intent.  *Id.*  The court will make every attempt to construe the contractual language such that no words, phrases, or terms are rendered ineffective or meaningless.  *Id*.  We must accept an interpretation of the contract that harmonizes its provisions, versus one that causes its provisions to conflict.  *Id.*

It is well established that a duty of care may arise where one party gratuitously or voluntarily assumes the duty.  *See, e.g., Delta Tau Delta, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968 (Ind. 1999).  An assumption of a duty creates a special relationship between the parties, as well as a corresponding duty to act as a reasonably prudent person.  *Id.*  Although the existence and extent of an assumed duty is generally a question of fact for the jury, it may be resolved as a matter of law if the designated evidence is insufficient to establish such a duty.  *Id.*  The Restatement (Second) Of Torts § 324A(b) (1965) states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or

8

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

"The actor must specifically undertake to perform the task he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully." *American Legion Pioneer Post No. 340 v. Christon,* 712 N.E.2d 532, 535 (Ind. Ct. App. 1999), *trans. denied.* Thus, the defendant must have undertaken the duty both "specifically and deliberately.... [I]t is also important that the party on whose behalf the duty is being undertaken relinquish control of the obligation; the party who adopts the duty must be acting '*in lieu of*' the original party." *Griffin v. Simpson,* 948 N.E.2d 354, 360 (Ind. Ct. App. 2011), *trans. denied*).

ABLA offered its adoption services to the Urbinas, and their respective rights and duties were set out in the Agreement – the contract in this case. In it, ABLA accepted the duty to perform certain specific services, some of which are also established by statute, others of which are found exclusively in the Agreement. The Agreement contains no provision that explicitly obligates ABLA to notify its client immediately upon receipt of the information. In fact, there is no provision that explicitly imposes a duty upon ABLA to share information that it acquired about the medical condition of the baby or the birth parents. The Agreement does, however, contain the following provision:

> The Agency cannot guarantee information provided to the Agency by a birth mother, birth father, medical professionals, or medical testing such as ultrasounds. *The Agency will work with the birth mother and birth father to gather all relevant information, but cannot guarantee the accuracy of the information we receive.* The Clients if concerned about the background

9

> information forms that are completed by or on behalf of a birth mother or birth father should have them reviewed by a medical professional whom the Clients can trust. In the event the birth mother consents, her prior medical records can be requested at your expense. Please be aware some birth mothers are more than willing to consent, but some interpret such a request as intrusive and untrusting and this request could jeopardize the match.

*Appellants' Appendix* at 22 (emphasis supplied). Thus, in this particular situation, ABLA had a contractual obligation to "work with the birth mother to gather all relevant information." *Id*. The use of the definite article "the" indicates that the birth mother and birth father referred to in this provision are the biological parents of a particular child that has been identified for adoption by the Urbinas. In the context of the nature of the relationship between an adoption agency and the Urbinas, we can think of no purpose for gathering such information other than to share it with the Urbinas. This would enable them to make informed decisions. Therefore, the duty to keep its clients apprised of the information gathered during the adoption process is inferred from the language of the contract whereby ABLA agreed to gather the information in the first place.

Having found the existence of a duty to divulge pertinent medical information to the Urbinas on contractual grounds, we need not determine whether such a duty arose upon alternate bases such as the duties of an agent to its principal or fiduciary duties that arose by virtue of the relationship between the Urbinas and ABLA. We reiterate that those theories of duty ultimately derive from the contract that we have concluded imposed a duty upon ABLA to disclose to the Urbinas any information it gathered about an identified candidate for adoption.

All of that said, we express no opinion as to the merits of the Urbinas' claim for damages based upon the breach of that duty with respect to any of the theories of recovery in the Urbinas' complaint for damages. We merely hold that in the current posture, i.e., a T.R. 12(B)(6) motion to dismiss, and considering only the facts alleged by the Urbinas in the complaint, the Urbinas might be entitled to establish under some set of facts that the Agreement imposed upon ABLA a duty to divulge to the Urbinas the contents of the social worker's call. In so doing, we stress that we may not even consider the alleged facts supporting ABLA's arguments that the "information" was not medically reliable (i.e., it came from a social worker and was never conveyed or confirmed by medical personnel treating the birth mother or baby), or that ABLA's action did not contravene the relevant statutory adoption guidelines that governed this process, or anything else offered by either party that was not included in, or submitted with, the complaint.[5] In view of the context in which this case is presented, i.e., a T.R. 12(B)(6) motion, we are constrained to consider only the complaint and the facts set forth therein. These were sufficient to survive a T.R. 12(B)(6) motion to dismiss.

2.

ABLA contends that even assuming a duty existed, the Urbinas contractually released any claim for breach thereof in the following paragraph of the Agreement, entitled

_____

[5] For instance, ABLA alleged in a brief in opposition to a motion to strike that the child indeed never did develop any special needs. While these and other alleged facts might have some significance if this case were before us in a different posture, e.g., the granting of a motion for summary judgment, such is not the case here. Because they are not in the complaint, we may not consider them.

11

"Assumption of Risk and Release":

> The [Urbinas] understand[] that in many adoption placement situations there are risks that may or may not be known to the [Urbinas], the Agency, its staff, consultants, independent contractors or others involved in assisting the Agency in this matter. The [Urbinas] in consideration of the mutual covenants herein, agree that the Agency, its staff, consultants, independent contractors, officers, [sic] board members shall not be liable at law or in equity nor shall the [Urbinas] bring, encourage to be brought, or instigate any legal action against the Agency[,] its staff, consultants, independent contractors, officers, [sic] board members regarding but not limited to, the medical or health condition of the birth mother, birth father, or child, representations made on or behalf [sic] of birth mother, birth father, or child history, or any other matter concerning the placement of the child with the [Urbinas] or finalization of the adoption of the child by the [Urbinas].

*Appellants' Appendix* at 24.

As with any other contract, the interpretation of a release "is determined by the terms of the particular instrument, considered in light of all facts and circumstances." *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994). Absent some ambiguity, release agreements are generally interpreted as a matter of law. *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374. If there is no ambiguity, we look only to the instrument to ascertain the parties' intent. *Id*.

The foregoing release provision explicitly would shield ABLA from liability arising from a claim premised upon an unknown medical condition of the child, birth mother, or birth father. The question is, unknown to whom? ABLA would have us construe the release to mean - unknown to the Urbinas. There are certainly circumstances where this would be true. The Agreement makes it clear that participants in the process of adoption must be aware that unknowns might arise and that the prospective adoptive parents are ultimately

12

beholden to the birthparents for information relating to the infant's medical history. That information is not always forthcoming, nor is it always reliable when it is provided. We have already held, however, that the Agreement obligates ABLA to share with the Urbinas whatever medical "information" it acquires about the infant or the birth parents. Thus, it does not contemplate that ABLA would "know" something about the infant that the Urbinas did not also know. In other words, for purposes of this provision of the contract, "risks that may or may not be known" must be construed to presume that the Urbinas' knowledge is coterminous with ABLA's knowledge.

Understood in this way, the interpretation that ABLA advocates would eviscerate the previously discussed contractual duty to disclose to the Urbinas any information ABLA obtains with respect to medical information about the child and birth parents. Such an interpretation would contravene our duty to read the contract as a whole and to harmonize its various provisions when possible. *See Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211. The provision upon which ABLA relies would not shield ABLA from liability arising from a determination that ABLA wrongfully withheld information from the Urbinas. We reiterate that we express no opinion on the question of whether ABLA breached the duty to disclose information to the Urbinas in the first place.

3.

The Urbinas contend that the trial court erred in dismissing their claim for intentional infliction of emotional distress. The Indiana Supreme Court first recognized the tort of intentional infliction of emotional distress in *Cullison v. Medley,* 570 N.E.2d 27 (Ind. 1991).

13

"The requirements to prove this tort are 'rigorous.'" *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002) (quoting *Ledbetter v. Ross,* 725 N.E.2d 120, 124 (Ind. Ct. App. 2000)). Intentional infliction of emotional distress arises "when a defendant: (1) engages in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another." *Id.* (quoting *Bradley v. Hall,* 720 N.E.2d 747, 752 (Ind. Ct. App. 1999)). "The intent to harm emotionally constitutes the basis of this tort." *Id.* Moreover, conduct that satisfies this definition "must exceed all bounds usually tolerated by a decent society and cause mental distress of a very serious kind." *Id.* Section 46 of the Restatement (Second) of Torts describes the extreme and outrageous conduct required to sustain a cause of action for this tort, as follows:

> d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

There are instances in which the question of whether certain conduct constitutes extreme and outrageous conduct within the meaning of this tort can be decided as a matter of law. *See*, *e.g.*, *Dietz v. Finlay Family Jewelry Corp.*, 754 N.E.2d 958 (Ind. Ct. App. 2001) (the court found no outrageous conduct where a store security manager accused an employee

14

of substance abuse, shoplifting, and dishonesty in a gruff and intimidating manner, where the security manager's actions occurred in the context of a detainment for the purpose of determining the extent of the employee's unauthorized conduct); *Conwell v. Beatty,* 667 N.E.2d 768 (Ind. Ct. App. 1996) (the court found no outrageous conduct where a sheriff announced a deputy's arrest at a press conference and refused to assist that deputy in completing retirement forms); *Gable v. Curtis,* 673 N.E.2d 805, 807 (Ind. Ct. App. 1996) (the court determined there was no outrageous conduct where a contractor's wife telephoned a purchaser seven times in one hour, and "screamed and yelled," threatening to repossess the home and stating repeatedly that the purchasers "would pay").

As was the case with the question discussed above concerning whether ABLA breached a duty to disclose, considering only the facts alleged by the Urbinas in the complaint, the Urbinas might be able to establish under some set of facts that the failure to disclose might satisfy the elements necessary to prevail in their complaint under this theory. Again, we stress that we may consider only the allegations of fact contained in the Urbinas' complaint for damages. We express no opinion as to whether this issue is ripe for determination as a matter of law after further development of the facts. We hold merely that, with respect to this theory of the Urbinas' complaint, dismissal under a T.R. 12(B)(6) motion to dismiss was not warranted. We therefore reverse and remand this cause with instructions to reinstate the complaint for damages.

Judgment reversed and remanded with instructions.

NAJAM, J., concurs.

BRADFORD, J., concurs with a separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

JESSICA and GERSON URBINA, )
                                             )
     Appellants-Plaintiffs, )
                                             )
     vs. )     No. 06A01-1210-CT-464
                                             )
TINA KLINKOSE-KYLER, LARONDA )
SOUTHWORTH, and A BOND OF LIFE )
ADOPTIONS, LLC, )
                                             )
     Appellees-Defendants. )
                                             )

**BRADFORD, Judge, concurring**

While I fully concur with the majority's disposition of this case, I write separately only to further emphasize what I consider the most significant holding of this case. I agree that the Agreement required ABLA to disclose to the Urbinas any relevant information gathered during the adoption process. In short, you get it–you pass it on. I also agree that the release in the Agreement does not cover nondisclosure and that it shields ABLA *only* from liability for any information that turns out to be incorrect. Quite simply, disclosure of incorrect information and nondisclosure are just not the same thing. Were we to accept ABLA's argument on this point, it would render the disclosure requirement meaningless.